UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TMT MANAGEMENT GROUP, LLC,       Civ. No. 14-4692 (MJD/JSM)

    Plaintiff,

v.       **REPORT AND RECOMMENDATION**

U.S. BANK NATIONAL ASSOCIATION, et. al.,

    Defendants.

The above matter came before the undersigned on Defendants' U.S. Bank National Association, Jacob vanBrandwijk and Richard Hartnack (collectively, "U.S. Bank") Motion to Dismiss Counts One Through 10. [Docket No. 51]. Philip L. Guarino, Esq. and Michael Weidner, Esq. appeared on Plaintiff's behalf. Brooks F. Poley, Esq., Reid Golden, Esq. and Paige Fitzgerald, Esq. appeared on behalf of defendants U.S. Bank, Jacob Vanbrandwijk and Richard Hartnack. There was no appearance by or on behalf of defendants United Credit Recovery, LLC, Leonard Potillo, or Wilbur Tate, III.[1]

---

[1]    United Credit Recovery, LLC ("UCR") was served with the Amended Complaint on April 7, 2015. [Docket No. 29]. Leonard Potillo was served on April 9, 2015. [Docket No. 31]. Wilbur Tate, III was served on April 6, 2015, and has never answered. [Docket No. 33]. UCR and Potillo received an extension of time to answer. [Docket Nos. 44, 48]. Potillo answered the Amended Complaint on June 8, 2015. [Docket No. 65]. UCR filed a pro se answer on June 8, 2015. [Docket No. 66]. On June 10, 2015, this Court issued a Report and Recommendation recommending that UCR's answer be stricken because a corporation cannot appear pro se in this district. [Docket No. 67]. The District Court adopted this Report and Recommendation and struck UCR's answer. [Docket No. 86]. On June 18, 2015, Potillo moved to stay the lawsuit because he was being held without bond at the Orange County, Florida correctional facility and lacked financial and legal resources to participate in the lawsuit. [Docket No. 69]. U.S. Bank and TMT opposed the motion. [Docket Nos. 74, 81]. This Court denied Potillo's motion on July 6, 2015. [Docket No. 82]. As a result, UCR and Tate have not answered the Amended Complaint, nor did they respond to the instant motion. U.S. Bank moved to stay discovery pending the outcome of the instant motion to dismiss. [Docket No. 75]. This Court granted the motion. [Docket No. 88].

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(A), (B), and Local Rule 72.1(c).  [Docket No. 58].

## I.   BACKGROUND

### A.   <u>Amended Complaint</u>

Plaintiff TMT alleged that TMT was a customer of defendant U.S. Bank and is in the business of purchasing debt from vendors, then reselling the debt to third parties. Amended Complaint, ¶ 1 [Docket No. 22].  Pursuant to Federal regulations, U.S. Bank was required to "charge off" its delinquent Demand Deposit Accounts ("DDAs").  <u>Id.</u>, ¶ 12.  U.S. Bank would realize a loss on the accounts, but the consumer account holder had a continuing obligation to repay the DDA.  <u>Id.</u>, ¶ 13.  To reduce its losses, U.S. Bank sold the DDAs to third-party debt purchasers and assigned them the right to collect on the charged-off accounts.  <u>Id.</u>, ¶ 14.  Each sale involved hundreds to thousands of individual accounts, ("DDA Portfolios"), with the balance of the DDAs often being in the millions of dollars.  <u>Id.</u>, ¶ 15.  Bids to purchase the debt were in cents on the dollar of the book value of the DDAs.  <u>Id.</u>, ¶ 16.  The value of a DDA Portfolio depended on the number of attempts made to collect the debt by a collection agency.  <u>Id.</u>, ¶ 17. For example, "one-agency" DDAs were more valuable than "two-agency" DDAs because less effort had been made to collect the debts.  <u>Id.</u>  From as early as 2008, U.S. Bank sold DDA Portfolios to defendant UCR.  <u>Id.</u>, ¶ 18.  Even though the DDA Portfolios were to be sold through an open bidding process, UCR was the only third party with which U.S. Bank did business between January, 2008, and September, 2011. <u>Id.</u>  U.S. Bank sold the DDA Portfolios to UCR for less than four cents on the dollar.  <u>Id.</u>

In September, 2009, TMT's banker with U.S. Bank, Todd Loosbrock, asked a U.S. Bank employee to pass along TMT's contact information to defendant Wilbur Tate, III, U.S. Bank's Assistant Vice President in Consumer Lending, Collections and Recovery.  Id., ¶¶ 3, 19.  Tate and defendant Jacob vanBrandwijk, a Senior Vice President and Director of U.S. Bank's Consumer Lending, Collections and Recovery office in Cincinnati, Ohio, were responsible for the DDA Portfolio bidding process and sales.  Id., ¶¶ 4, 20.  From September, 2009 through July, 2010, TMT repeatedly attempted to contact Tate to bid on DDA Portfolios, but Tate refused to respond.  Id., ¶¶ 21, 22.  Tate refused to consider TMT's purchase proposal, even though TMT was a U.S. Bank client (UCR was not) and U.S. Bank had a policy that supposedly favored bank clients.  Id., ¶ 23.

In or around August, 2010, Tate told Loosbrook that UCR was bidding less on DDA Portfolios than TMT was offering.  Id., ¶ 24.  Tate finally told TMT that it could bid on the September, 2010, DDA Portfolio and represented that U.S. Bank would accept bids from TMT in the form of a certain number of cents per dollar of book value of the DDA.  Id., ¶ 25.  Tate told TMT that U.S. Bank employed an open bid process in connection with the DDA Portfolios.  Id., ¶ 26.  This representation was restated on April 15, 2011, and in May, 2011, by vanBrandwijk, and on May 9, 2011, by defendant Richard Hartnack, now-retired Vice Chairman of Small Business Banking for U.S. Bank.  Id., ¶¶ 5, 26.

TMT submitted a bid of $0.055 for the September, 2010 DDA Portfolio.  Id., ¶ 27.  The bid was initially awarded to TMT but then was disallowed because, according to Tate, U.S. Bank did not have on file a non-disclosure agreement from TMT.  Id., ¶ 28.

3

Tate represented that this non-disclosure agreement was required as part of the bidding process – a representation reiterated by Tate and vanBrandwijk through March, 2012. Id.  U. S. Bank had not previously told TMT that a non-disclosure agreement was a prerequisite for bidding.  Id., ¶ 29.

TMT sent a non-disclosure agreement to U.S. Bank by e-mail on November 23, 2010, copying Loosbrock on its correspondence.  Id., ¶ 31.  TMT bid $0.055 for the November DDA Portfolio, but lost out to UCR.  Id. ¶ 32.  After this, TMT's principal learned that UCR was bribing Tate to ensure UCR's purchases of the DDA Portfolios. Id. ¶ 33.  In January, 2011, TMT's principal phoned Tate to ask about the bribes, and Tate hung up.  Id. ¶ 34.  Tate resigned from U.S. Bank on February 1, 2011, and thereafter, U.S. Bank directed TMT to contact U.S. Bank Vice President Kirk Villaloboz regarding future bids.  Id., ¶ 35.

At a meeting with Villaloboz, Loosbrock and TMT in March, 2011, Villaloboz agreed to enter into a five-year forward flow agreement[2] with TMT, which permitted

---

[2]     The Eleventh Circuit has described forward flow agreements in this context as follows:

> When a consumer is delinquent on a credit account, the company that provided the account begins by trying to collect the debt itself.  After 180 days, however, the company normally sells the debt to a wholesale purchaser. Most sales of debt occur in large pools.  Some of these pools are sold at auction.   Others are sold pursuant to long-term contracts with large purchasers, so-called "forward-flow contracts." Forward-flow contracts are attractive to the seller because they provide a consistent and reliable way to get rid of debt. They are attractive to the wholesaler because they provide a reliable supply and also typically guarantee that the accounts are a representative sample of the company's debt pool and that none of the debtors are deceased or bankrupt.

S.E.C. v. Merch. Capital, LLC, 483 F.3d 747, 750 (11th Cir. 2007).

TMT to purchase DDA Portfolios on a going forward basis at the rate of $0.055. <u>Id.</u>, ¶ 36. At the meeting, U.S. Bank also agreed to sell to TMT that quarter's DDA Portfolio under those terms. <u>Id.</u>, ¶ 37. About a week later, Villaloboz reneged on the agreement, stating that vanBrandwijk would not agree to the DDA Portfolio purchase or the forward flow agreement. <u>Id.</u>, ¶ 38.

On April 11, 2011, TMT informed U.S. Bank by email that Potillo and UCR were engaging in bribery to purchase DDA Portfolios. <u>Id.</u>, ¶ 39. At a meeting on April 15, 2011, TMT told Loosbrock, vanBrandwijk and Villaloboz that UCR was bribing Tate, to which vanBrandwijk responded that "although it may be wrong, it is not illegal." <u>Id.</u>, ¶ 42. At this meeting, vanBrandwijk also stated that U.S. Bank did not allow forward flow DDA contracts, despite the fact that Villaloboz had earlier represented that it did, and TMT had heard from vanBrandwijk and another U.S. Bank representative that U.S. Bank had a forward flow agreement with UCR. <u>Id.</u>, ¶ 43. Additionally, at this meeting, vanBrandwijk falsely stated that one of the reasons TMT had not won a bid was the lack of a non-disclosure agreement. <u>Id.</u>, ¶ 45. vanBrandwijk directed TMT to deal with Villaloboz, and stated that TMT should lower its bid from $0.055 to $0.045 and if it did so, TMT would be awarded the April, 2011 DDA Portfolio. <u>Id.</u>, ¶ 46. No one could understand why vanBrandwijk would want TMT to offer U.S. Bank less money. <u>Id.</u>

TMT bid $0.045 for the April, 2011 DDA Portfolio, but lost out to UCR. <u>Id.</u>, ¶ 48. vanBrandwijk told TMT that its bid was the only one U.S. Bank received but nonetheless, UCR won the bid because it had a forward flow contact with U.S. Bank at a guaranteed price of $0.045. <u>Id.</u>, ¶ 49. This contract had a 30-day exit clause, which vanBrandwijk had failed to timely invoke. <u>Id.</u> vanBrandwijk stated that TMT could bid

on the next DDA Portolio.  Id., ¶ 50.  Villaloboz later confirmed that TMT's was the only bid received for the April, DDA Portfolio.  Id., ¶ 51.

On May 6, 2011, TMT e-mailed Hartnack and copied Loosbrock on the email. Id.,¶ 52.  TMT again raised concerns that UCR and Potillo had been bribing U.S. Bank officers for years to purchase DDA Portfolios.  Id., ¶ 52.  Hartnack stated that he would look into the matter, but instead of investigating, concluded that the accusations were poorly documented and amounted to competitor disagreements.  Id., ¶¶ 54, 56.

On May 13, 2011, vanBrandwijk told TMT that U.S. Bank offered DDA Portfolios for sale quarterly and it would include TMT in the bidding process, the bids would be open, and the terms of each sale confirmed before the deal was consummated.  Id., ¶ 57.  vanBrandwijk further stated that each bidder that completed a non-disclosure agreement would be offered a prospectus and an opportunity to examine the file before bidding closed.  Id.

On July 11, 2011, TMT bid $0.045 for a DDA Portfolio of $30,000,000.  Id., ¶ 58. Vincent Lorenzo, Outsourcing Manager for U.S. Bank, told TMT the bid was insufficient, so TMT increased its bid to $0.0525.  Id.  Even though TMT submitted the highest bid, TMT again lost out to UCR because UCR allegedly had a "first right of refusal" and met and exceeded TMT's bid.  Id., ¶ 59.  U.S. Bank told TMT that if it had stayed with its original numbers, it would have been awarded the purchase.  Id.  Yet TMT only lowered its bid based on U.S. Bank's advice.[3]  Id.  U.S. Bank had never previously disclosed that UCR had a right of first refusal.  Id., ¶ 60.  After losing this bid, TMT's banker,

---

[3]   This statement is very confusing, because in paragraph 58 of the Amended Complaint TMT stated that it had raised, not lowered, its bid based on information from U.S. Bank's Outsourcing Manager, Vince Lorenzo.  Perhaps, TMT is referencing its earlier bid of $0.055.  Amended Complaint, ¶ 51.

Loosbrock, e-mailed Hartnack to complain about U.S. Bank's treatment of TMT and noted that U.S. Bank had lost over $2.0 million on DDA Portfolio sales over the past four quarters by rejecting TMT's bids.  Id., ¶¶ 62, 63.  But what Loosbrock "undoubtedly" did not know was that UCR was paying U.S. Bank significantly more than the DDA Portfolios were worth, which UCR could afford to do because it was defrauding third-party purchasers by reselling the DDA as zero-agency paper when in reality it was two-agency paper.  Thus, U.S. Bank was benefitting by selling its two-agency paper at a premium.  Id., ¶ 64.

On September 14, 2011, TMT emailed vanBrandwijk and notified him of a personal relationship between Potillo, Tate and UCR and of the existence of a misleading affidavit signed by Tate.  Id., ¶¶ 66, 67.  TMT had previously provided vanBrandwijk with false affidavits by UCR and Tate.  Id., ¶ 67.

In September, 2011, TMT successfully bid on what it believed was zero-agency debt for $0.0515.  Id., ¶ 69.  TMT also based its bid on vanBrandwijk's August 19, 2011 false representation that UCR's bid was in excess of $0.045 and U.S. Bank wanted to "shake some more out of the DDA agency returns."  Id., ¶ 69.  Almost immediately, UCR and Potillo retaliated by posting a comment in a public forum that TMT's recent purchase was of two-agency paper, while UCR had zero-agency paper.  Id., ¶ 71.  TMT shared its concerns about this posting with vanBrandwijk, who responded that "whomsoever posted the comment has a problem with the facts."  Id., ¶ 72.  TMT paid U.S. Bank the purchase price for the DDA Portfolio of $1,667,242 on October 3, 2011.  Id., ¶ 74.  The next day, Villaloboz informed TMT for the first time, and contrary to vanBradnwijk's representations, that the DDA Portfolio TMT had just purchased was

two-agency paper.  Id., ¶ 75.  Much later, on May 21, 2012, Villaloboz sent another letter on U.S. Bank letterhead, retracting the statements he made in his October 4, 2011, letter and stating that he had lacked authority to send the letter.  Id., ¶ 76.  TMT pled on information and belief that the May 21, 2012, letter was fabricated and forged. Id.

In March, 2012, TMT successfully bid $0.0495 for U.S. Bank's first quarter DDA Portfolio – an overbid based on vanBrandwijk's August 19, 2011, false statement that UCR was bidding in excess of $0.045, and U.S. Bank was trying to increase the amount it realized from DDA Portfolio sales.  Id., ¶ 77.  In reality, UCR had been bidding much less than $0.040 on the dollar.  Id.  TMT paid the purchase price of $1,154,715 on March 26, 2012.  Id., ¶ 79.  Afterwards, TMT asked U.S. Bank to complete a seller survey.  Id., ¶ 80.  One of the survey questions asked U.S. Bank to state how many agencies had collected on the accounts "after your purchase."  Id.  U.S. Bank responded "[i]ndicated in Offering or additional declaration Document."  Id.  This response was false, as no offerings or additional documents were ever provided to TMT.  Id.

In sum, TMT alleged that it bid on DDA Portfolios six times: (1) September, 2010 (unsuccessful, purportedly due to the lack of a non-disclosure agreement); (2) November, 2010 (unsuccessful, without explanation by U.S. Bank); (3) April, 2011 (unsuccessful because of the purported forward flow agreement between U.S. Bank and UCR); (4) July, 2011 (unsuccessful because UCR had a "first right of refusal" and had met and exceeded TMT's bid); (5) September, 2011 (successful bid of $0.0515 for

fourth quarter, 2011 Portfolios); (6) March, 2012 (successful bid of $0.0495).  Id., ¶¶ 27-35, 47-51, 57-60, 68-80.

On May 8, 2013, U.S. Bank, through Kent Stone, a U.S. Bank Vice Chairman, agreed to sell TMT at least $200,000,000 of U.S. Bank DDA Portfolios for $0.03 cents on the dollar.  Id., ¶¶ 84, 85.  TMT arrange to sell the May, 2013 DDA Portfolio to a third party for $0.0775 cents on the dollar, but thereafter U.S. Bank failed to sell the DDA Portfolio to TMT.  Id., ¶ 86.  In July, 2014, vanBrandwijk left U.S. Bank.  Id., ¶ 87.

Tate was arrested on February 27, 2013, and charged with conspiracy to commit bank bribery.  Id., ¶ 88; Amended Complaint, Ex. A (Criminal Complaint against Tate in the United States District Court, District of Connecticut).  The criminal complaint against Tate stated that he was in charge of outsourcing collection accounts to collection agencies, including Oxford Collection Agency ("Oxford").  Id., ¶ 87.  Executives of Oxford pled guilty to conspiracy to commit wire fraud, bank fraud and money laundering in December, 2012, and told a Special Agent that they had been bribing Tate with $2,500 to $5,000 per month in cash.  Id., ¶ 90.  An Information was filed against Tate and a separate Information was filed against Oxford executives.  Id., ¶ 91; Amended Complaint, Ex. B (Information filed against Tate).  Tate pled guilty on November 22, 2013, and as detailed in the Information, Tate used both the mails and wires.  Id., ¶¶ 93-95.

On June 4, 2014, Potillo was indicted in the U.S. District Court for the Middle District of Florida on 33 counts of wire fraud, bribery of a bank official and unlawful monetary transactions.  Id., ¶ 96; Amended Complaint, Ex. C (Indictment against Potillo).  As part of his scheme, Potillo represented to investors that they were

purchasing zero-agency or one-agency debt that UCR had purchased from U.S. Bank, when, in fact, it was two-agency debt.  Id., ¶ 99.  Potillo created false affidavits from U.S. Bank officers falsely "confirming" the quality of the debt.  Id., ¶ 99.  Potillo paid Tate more than $1.0 million in bribes to enable UCR to purchase DDA Portfolios for $31.0 million, or less than four cents on the dollar.  Id., ¶ 100.  Potillo used wires and the mail to effectuate transfers of funds to purchase luxury vehicles, real estate and to bribe Tate.  Id., ¶¶ 101-103.  UCR continued bribing Tate after he left U.S. Bank on February 1, 2012, and the bribes continued well into 2012.  Id., ¶ 104.  The indictment stated that Tate received over $1.0 million in bribes when he was employed by U.S. Bank.  Id., ¶ 103.

TMT alleged that as a result of this fraudulent scheme and U.S. Bank's misrepresentations as to the DDA being zero-agency paper, TMT overpaid for its purchases of DDA Portfolios in September, 2011 and March, 2012.  Id., ¶ 105. Additionally, TMT was denied the opportunity of purchasing eleven U.S. Bank DDA Portfolios, which were sold to UCR as part of the fraudulent scheme.  Id., ¶ 106.  Absent the scheme, TMT was or would have been the highest bidder on the DDA Portfolios and could have resold them to third party purchasers.  Id.  Also as a result of the scheme and misrepresentations, the sale of U.S. Bank DDA Portfolios was suspended from the second quarter of 2012 through 2013 and TMT lost its ability to bid on, purchase, and resell DDA Portfolios during this time and lost over $9.0 million in profits.  Id., ¶ 107.  As a result of U.S. Bank's breach of its agreement to enter into a five-year forward flow agreement, TMT suffered damages in excess of $13.0 million.  Id., ¶ 108.  As a result of U.S. Bank's breach of its May 8, 2013 agreement to sell to TMT the DDA Portfolio, TMT

suffered damages in excess of $9.0 million.  Id., ¶ 109.  In all, TMT claimed $70,000,000 in damages, of which it contended over $48,000,000 had to be trebled due to U.S. Bank's RICO and antitrust violations.  Id., ¶ 110.

Based on these facts, TMT alleged the following causes of action.

In Counts One and Two, TMT alleged civil RICO claims and conspiracy to violate RICO under 18 U.S.C. § 1962(c) and (d) against all defendants except Hartnack, and sought damages in excess of $48.0 million.  Id., ¶¶ 111-166.

Count Three alleged that UCR and U.S. Bank violated Section One of the Sherman Act (15 U.S.C. § 1) by conspiring to fix the price at which U.S. Bank would sell DDA Portfolios to UCR and conspiring to assure that "no parties such as TMT would be able to successfully bid on U.S. Bank DDA Portfolios, thereby allocating the entire market of all U.S. Bank DDA Portfolio sales to UCR."  Id., ¶¶ 168, 169.  TMT alleged that such conduct by UCR and U.S. Bank was a per se violation the Sherman Act, for which TMT sought in excess of $48.0 million actual damages.  Id., ¶¶ 170, 171.

Count Four alleged that U.S. Bank and UCR violated Minnesota Chapter 325D (Restraint of Trade) by conspiring to fix the rate at which U.S. Bank DDA Portfolios would be sold to UCR and by refusing to deal with TMT and others seeking to purchase U.S. Bank DDA Portfolios, thereby diminishing competition.  Id., ¶¶ 174-176.  TMT sought in excess of $48.0 million actual damages.  Id., ¶ 177.

Count Five alleged respondeat superior against U.S. Bank based on allegations that TMT had notified U.S. Bank employees Loosbrock, vanBrandwijk, Hartnack and Villaloboz that UCR was bribing Tate so UCR could purchase the DDA Portfolios.  Id., ¶¶ 179-189.  U.S Bank did nothing to stop its officers' wrongful actions and instead

directed TMT to work with the "same corrupt individuals that U.S. Bank had knowingly entrusted with the sale of its DDA Portfolios." Id., ¶ 190. TMT alleged that U.S. Bank was vicariously liable for the wrongful conduct of its officers under the doctrine of respondeat superior, and for all damages for violations of the Clayton Act, Minnesota Chapter 325D and its state law claims. Id., ¶ 191.

Counts Six and Seven alleged intentional and negligent misrepresentation against U.S. Bank, Tate, vanBrandwijk and Hartnack, (id., ¶¶ 193-219), including eighteen specific examples of what TMT alleged were false representations made by U.S. Bank employees on U.S. Bank's behalf, including defendants Tate, vanBrandwijk and Hartnack. Id., ¶ 204. TMT alleged that U.S. Bank intended TMT to rely and TMT reasonably and justifiably relied on these statements, and was damaged in excess of $48.0 million. d., ¶¶ 205-213, 216, 219.

Count Eight alleged breach of contract against U.S. Bank based on two separate contracts. Id., ¶¶ 221-226. First, TMT alleged that on March 17, 2011, it entered into a five-year forward flow contract with U.S. Bank for the purchase of DDA Portfolios at the rate of $0.055. Id., ¶ 221. U.S. Bank breached this agreement when it did not allow TMT to purchase the 2011 second quarter DDA Portfolio at the rate of $0.055, and TMT was damaged in excess of $13.0 million. Id., ¶¶ 222, 223. Second, on May 8, 2013, U.S. Bank, through Stone, entered into an agreement for the purchase by TMT of $200,000,000 of U.S. Bank DDA Portfolio at $0.03 as a one-time transaction. Id., ¶ 224. TMT arranged to sell this Portfolio to a third party for $0.0775 on the dollar but then U.S. Bank breached its agreement and TMT was damaged in excess of $0.0 million. Id.

Count Nine alleged unjust enrichment against U.S. Bank and TMT sought damages in excess of $1.1 million. Id., ¶¶ 228-233. TMT claimed that it overpaid for what it believed was zero-agency debt (which was actually two-agency debt) and U.S. Bank knowingly received the benefit of TMT's overpayment. Id., ¶¶ 229, 230. Moreover, TMT paid more than fair value because U.S. Bank falsely told TMT that UCR was paying $0.045. Id., ¶ 229.

Count Ten alleged negligent supervision against U.S. Bank for which TMT sought damages in excess of $70.0 million. Id., ¶¶ 235-237. TMT alleged that U.S. Bank had a duty to use reasonable care to supervise the bank officers acting on its behalf and failed to exercise that reasonable care regarding Tate, vanBrandwijk, Hartnack and "others at U.S. Bank" knowing that the officers were in a position where they could harm TMT. Id., ¶ 236.[4]

---

[4] TMT did not respond to U.S. Bank's argument in support of dismissing Count Ten. See TMT's Brief in Opposition to Motion to Dismiss ("TMT's Mem.") [Docket No. 63]. As a result, it waived its objections. Njema v. Wells Fargo Bank, N.A., --F. Supp. 3d--, Civ. No. 13-519 (PJS/JSM), 2015 WL 5008940, at *12 (D. Minn. Aug. 18, 2015) (failing to respond to defendant's statements in a motion for summary judgment regarding damages resulted in waiver of plaintiff's argument on that point) (citing Salaimeh v. Messerli & Kramer, P.A., Civ. No. 13–3201 (DSD/HB), 2014 WL 6684970, at *2, n. 2 (D. Minn. Nov. 25, 2014) (noting that plaintiff did not address certain issues raised by defendant in her opposition to summary judgment and stating "[a]lthough this court considers those claims, it notes that they have been effectively waived.") (citing Satcher v. University of Ark. at Pine Bluff Bd. Of Trs., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.")). At any rate, TMT agreed at the motion to dismiss hearing that this Court could recommend dismissal of Count Ten. As a result, the Court will not address Count Ten further in this Report and Recommendation except to recommend its dismissal with prejudice (the relief sought by U.S Bank and not opposed by TMT) to the District Court.

### B.      U.S. Bank's Motion to Dismiss and TMT's Response[5]

U.S. Bank, vanBrandwijk and Hartnack (hereafter collectively referred to as "U.S. Bank") moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on numerous grounds.   For starters, and before addressing the specific counts of the Amended Complaint, U.S. Bank argued that TMT pled no actionable facts regarding vanBrandwijk and Hartnack, and no facts to support any claim that U.S. Bank was aware of Tate's illegal activities while he was employed by U.S. Bank.   U.S. Bank Memorandum in Support of Motion to Dismiss ("U.S. Bank Mem."), pp. 5-7 [Docket No. 55].   For example, the only statement regarding any alleged criminal activity by vanBrandwijk was contained in paragraph 134 of the Amended Complaint, which stated that he "conducted and/or participated, directly or indirectly, in the affairs of the RICO enterprise through a pattern of racketeering activity. He engaged in wire and mail fraud to further the scheme of fraud and to make false representations, and accepted bribes, all so as to prevent TMT from purchasing U.S. Bank DDA Portfolios and assure they would be sold to UCR."   Amended Complaint, ¶ 134.   According to U.S. Bank, this allegation was conclusory and unsupported by any facts that vanBrandwijk engaged in any criminal activity or that U.S. Bank had any knowledge of such activity.   U.S. Bank Mem., p. 6.

Likewise, TMT alleged that Tate resigned on February 1, 2011, and that TMT did not inform U.S. Bank of his acts of bribery until months later.   Id., pp. 6-7. Consequently, but for its conclusory claims of knowledge, TMT pled no facts to support

---

[5]      The parties' arguments in favor of and opposing dismissal of the federal claims are considered in more detail, infra.

any claims that U.S. Bank was aware of Tate's misconduct while he was employed at U.S. Bank.  Id.,

Further, U.S. Bank contended that TMT alleged no actionable conduct by Hartnack.  Id., p. 7.  TMT's claims that it informed Hartnack on April 15, 2011, that it had been "mislead and totally blown off" by vanBrandwijk, (Amended Complaint, ¶ 53), even if true, neither constituted racketeering activity under RICO, nor was otherwise unlawful. Id.  TMT also alleged no facts that it had apprised Hartnack of any mail or wire fraud or that it was accusing vanBrandwijk of fraud, bribery, or any other unlawful activity.  Id. (citing Amended Complaint, ¶ 42; Ex. B at 2-3.).

Proceeding to the specific counts, U.S. Bank contended that TMT's RICO claims (Counts One and Two), must be dismissed because of numerous fatal pleading errors. First, TMT failed to distinguish between a RICO person and RICO enterprise and failed to plead a RICO enterprise distinct from the alleged pattern of racketeering activity.  Id., pp. 8-10.  Second, the four-year statute of limitations had run on TMT's RICO claims, based on an email from TMT's president, Mark Bugni, to U.S. Bank, which showed that TMT was aware of the alleged RICO violation over three years before the 4-year statute of limitations had begun to run.  Id., pp. 10-13 (citing Affidavit of Brooks Poley in Support of Motion to Dismiss ("Poley Aff."), Ex. A).  Third, to the extent that TMT was alleging a RICO claim in connection with the March, 2012, DDA Portfolio, the one-year contractual limitation in the purchase agreement barred TMT's action.  Id., pp. 13-14. Fourth, the Amended Complaint failed to plead facts establishing U.S. Bank's participation in any purported RICO scheme.  Id., pp. 14-16.  Lastly, TMT's RICO

conspiracy claim (Count Two) failed because its underlying RICO claims failed.  Id., p. 16.

U.S. Bank asserted that the federal and state antitrust claims (Counts Three and Four) must be dismissed because TMT did not plead an actionable restraint of trade (e.g., price fixing or boycotting) and the alleged restraints of trade were permissible vertical agreements, which "are almost never illegal per se."  Id., pp. 17-21.  Moreover, TMT did not allege a viable violation of Section 1 of the Sherman Act under the rule of reason.  Id., pp. 22-24.  As TMT's state law antitrust claim was factually identical with its federal antitrust claims and TMT had failed to plead a viable federal claim, its state law claim also had to be dismissed for failure to state a claim.  Id., p. 25.

As to Count Five alleging respondeat superior, U.S. Bank contended that TMT failed to plead sufficient facts showing that U.S. Bank was responsible for the alleged actions of Tate and vanBrandwijk, including the factual predicates necessary to meet the high standards required for a finding of vicarious liability under RICO and a RICO conspiracy, and for any state law claims.  Id., pp. 34-39.  Besides, U.S. Bank could not be held liable for any statements Tate may have made after he was no longer a bank employee.  Id., p. 36.

U.S. Bank submitted that TMT's intentional and negligent misrepresentation claims (Counts Six and Seven) failed because TMT failed to allege facts to establish reliance or causation.  Id., pp. 26-29.  Additionally, U.S. Bank allegations regarding the September, 2011, DDA Portfolio were vague and "overstated," there were no actionable misrepresentations regarding the March, 2012 DDA Portfolio and, at any rate, any claims arising out of the March, 2012, DDA Portfolio purchase were barred by the one-

year statute of limitations contained in the purchase agreement. Id., p. 29-34. U.S. Bank pointed to an email it claimed demonstrated that TMT was told the September, 2011 DDA Portfolio was two-agency debt before TMT's purchase. Id., p. 30 (citing Affidavit of Brooks Poley, Ex. E).[6]

U.S. Bank moved to dismiss Count Eight asserting a breach of contract claim, contending that as to the supposed March, 2011, oral agreement to enter into a five-year forward flow contract, this claim was barred by the statute of frauds because the contract could not be performed within one year. Id.. p. 40. Furthermore, TMT did not sufficiently allege that U.S. Bank and TMT formed a valid contract in May, 2013, for the sale of $200,000,000 worth of DDA Portfolios. Id., pp. 40-41. According to U.S. Bank, there was no agreement as to quantity or price and therefore, no enforceable agreement was ever formed. Id.

U.S. Bank moved to dismiss Count Nine asserting unjust enrichment, contending that TMT was not eligible for this equitable relief where it had also alleged that written contracts governed the parties' rights. Id., p. 41.

Finally, as to Counts One through Seven and Nine collectively, U.S. Bank argued that these counts were based on TMT's flawed theory that but for U.S. Bank's fraudulent scheme, it would have been able to purchase certain DDA portfolios; yet, TMT failed to allege sufficient factual content to permit the Court to infer that was the

---

[6]  For the reasons described infra, the Court will not consider this exhibit. U.S. Bank stated that it was not offering the document in support of its motion and then did exactly that. U.S. Bank Mem., pp. 30-31. The Court also did not consider Exhibit F to the Poley Affidavit, which U.S. Bank stated it was submitting "for purposes of illustration only" and then relied on the exhibit to show that TMT's statement that it never received any offering materials regarding the March, 2012 DDA Portfolio was "patently false." Id., p. 32, n.18.

case.  Id., p. 42.  As a result, all claims based on this theory of "causation" had to be dismissed.  Id., pp. 42-43.

TMT opposed the motion, arguing generally that it had properly pled its causes of action, and that U.S Bank was vicariously liable for the misconduct of its high-level officers because the it had written notice of Tate's criminal behavior, the officers' misrepresentations occurred during the scope of their employment, and the actions of the bank's high level officers benefitted the bank.  TMT's Memorandum in Opposition to Motion to Dismiss ("TMT's Mem."), pp. 6-12 [Docket No. 63].

TMT rejected U.S. Bank's argument that it pled no actionable facts regarding vanBrandwijk and Hartnack, and no facts to support any claim that U.S. Bank was aware of Tate's illegal activities while he was employed by U.S. Bank.  Id., pp. 23-26. According to TMT, it pled "scores" of specific facts showing that vanBrandwijk was involved in the "fraudulent scheme, pattern of racketeering activity and anti-competitive behavior of U.S. Bank."  Id., p. 24 (citing Amended Complaint, ¶¶ 17, 38, 43, 46, 48, 66, 67, 75, 81, 82).  The Amended Complaint stated that vanBrandwijk misrepresented the quality of the DDA Portfolios, the requirement for a non-disclosure agreement prior to bidding, U.S. Bank's failure to receive a non-disclosure agreement from TMT, the terms and conditions for the purchase of DDA Portfolios, the amount being bid by UCR for the DDA Portfolios, and the bidding process was fair and open.  Id. (citing Amended Complaint, ¶ 149).  TMT further argued that it had alleged that vanBrandwijk accepted bribes to prevent TMT from purchasing DDA Portfolios.  Id., p. 25 (citing Amended Complaint, ¶¶ 127, 134).  TMT told vanBrandwijk numerous times about the bribery and other fraudulent acts, yet vanBrandwijk did nothing, leading a reasonable finder of fact

to conclude that he was also accepting bribes. Id., p. 25.  As to Hartnack, TMT noted that Hartnack is not a RICO defendant, although he also misrepresented facts to TMT. Id. (citing Amended Complaint, ¶¶ 52-54, 196, 204).

As for its RICO claims, TMT asserted that it had properly alleged the requisite distinctions between a RICO enterprise and RICO persons, and between a RICO enterprise and a pattern of racketeering.  Id., pp. 12-19.  Regarding the former, TMT maintained that the "association-in-fact enterprise" consisted of "U.S. Bank, two of its high-level officers, an outside company (UCR) and its principal (Potillo).  U.S. Bank is a separate legal entity distinct from the alleged association-in-fact enterprise, . . . ." Id., p. 13.  Regarding the latter, TMT submitted that the "enterprise engaged in conduct distinct and apart from the predicate acts of racketeering" such as "acts necessary to close sales, obtain closing proceeds, and provide post-sale services (e.g. providing bills of sale, U.S. Bank affidavits of correctness/assignment, and records relating to loans sold [ ]),"[7] and "undoubtedly engaged in certain legitimate sales of U.S. Bank DDA Portfolios outside of defendants' pattern of racketeering."  Id., pp. 16-18 (citing Amended Complaint, ¶ 122 ("The enterprise and its members conducted other business wholly separate and apart from the pattern of racketeering activity")).  In any event, TMT urged that "discovery undoubtedly will reveal that there were certain U.S. Bank DDA Portfolio sales where it was unnecessary to commit RICO predicate acts in order for UCR to be awarded the DDA Portfolios."  TMT's Mem., p. 18.  Alternatively, TMT claimed that "even if the association-in-fact enterprise were a wholly criminal association, . . . the facts alleged demonstrate that it had a distinct structure and an

---

[7]      These facts were not pled in the Amended Complaint.

organizational pattern or system of authority and planning beyond that which was necessary to perpetrate the predicate crimes, including but not limited to a division of the gains reaped through the pattern of racketeering activity." Id., p. 19.  Therefore, "an enterprise separate and distinct from the pattern of racketeering has been alleged." Id. (citing United States v. Bledsoe, 674 F.2d 647, 665 (8th Cir. 1982), cert. denied, 459 U.S. 1040 (1982)).[8]

TMT denied that the statute of limitations had run on its RICO claims. Id., pp. 19-20.  According to TMT, nothing in the April 11, 2011, email cited by U.S. Bank in support of this argument would have put TMT on notice that Potillo was bribing U.S. Bank years later. Id., p. 20.  Nor would the fact that Tate had informed TMT in August of 2010, that "UCR was bidding substantially less for U.S. Bank DDA Portfolios than the $0.055 (on the dollar) that TMT was offering," (Amended Complaint, ¶ 24), have put TMT notice that Tate or others at U.S. Bank were being bribed. Id., pp. 20-21.  Additionally, there was ample evidence to support tolling of the statute of limitations, because TMT had asked whether U.S. Bank officers were engaged in criminal conduct, and the bank had concealed the fact that it was occurring. Id., p. 21.  TMT also rejected U.S. Bank's argument that the one-year statute of limitations in the DDA Portfolio purchase agreement had any bearing on its RICO claims. Id., p. 22.  TMT noted that it was not asserting a claim for breach of the purchase agreement and, at any rate, TMT's RICO claims, were controlled by the four-year statute of limitations. Id.

---

[8]    In Bledsoe, the Eighth Circuit described the requirement for an ascertainable structure distinct from the pattern of racketeering activity in terms of criminal enterprises, such as a Mafia family or prostitution ring, both of which would have an organizational structure and system of authority beyond that necessary to perpetuate the predicate crimes.  674 F.2d at 665.

Finally, TMT contended that as it had properly pled its RICO claim, there was no basis to dismiss its RICO conspiracy claim. Id., p. 23.

Regarding its antitrust claims, TMT submitted that U.S. Bank fixed bids so that all horizontal competition was destroyed, a per se violation of Section 1 of the Sherman Act. Id., pp. 27-41.   As for U.S. Bank's argument regarding the rule of reason, TMT argued that it should be permitted to amend its Amended Complaint to plead the illegality of U.S. Bank's conduct under a rule of reason analysis. Id., p. 41.  In addition, TMT's antitrust claims were viable under Minn. Stat. § 325D.53, which makes it per se illegal to refuse to deal with another party, allocate markets, allocate customers or fix or control the price of commodities. Id., pp. 42-43.

Regarding its contract claims, TMT rejected U.S. Bank's statute of frauds argument, noting that the statute does not require that a contract be fully performed within a year; only that it be commenced within a year, as was the case here.  Id., pp. 43-44.  But even if the statute of frauds did apply, TMT contended that U.S. Bank should be estopped from asserting it where its dealings with TMT in connection with its contractual commitments were all "part and parcel" of U.S. Bank's pattern of racketeering activity.  Id., pp. 44-45.  Additionally, discovery may reveal the existence of a writing in U.S. Bank's possession that would satisfy the statute of frauds.  Id., p. 45.

As to the contract dated May 8, 2013, TMT contended that it was an enforceable oral agreement and contrary to U.S. Bank's position, agreement on the material terms of price ($0.03 cents on the dollar for every dollar of DDA) and quantity ($200,000,000) had been reached.  Id., pp. 45-46 (citing Amended Complaint, ¶ 224).

As for U.S. Bank's arguments regarding causation and reliance, TMT asserted that each time a false misrepresentation was made regarding why it did not win a bid, TMT relied on that misrepresentation to continue bidding, working with U.S. Bank and "entering into broken contracts with U.S. Bank and suffering injury." Id., p. 47. Similarly, TMT countered U.S. Bank's argument that it did not change its position based on the misrepresentation by stating that it the misrepresentations caused TMT to continue dealing with U.S. Bank and the misrepresentations "contributed to" TMT not being awarded bids. Id. In response to U.S. Bank's challenge regarding how TMT could have reasonably relied on the false representation that it would be awarded a bid if it lowered its bid price, TMT submitted that in light of U.S. Bank's previous unfair treatment of it, a reasonable person might conclude that U.S. Bank was trying to "redeem" itself by telling TMT that it was bidding higher than necessary. Id., p. 48.

TMT rebuffed U.S. Bank's argument that TMT's intentional and negligent misrepresentation counts fail because it cannot show causation – i.e., that it would have been the successful bidder on the DDA Portfolios absent U.S. Bank's fraud, and that as a result, causation was lacking. Id., pp. 55-56. TMT submitted that the evidence on that point (who bid what at each sale) was in U.S. Bank's possession and would be disclosed in discovery. Id., p. 56. Additionally, TMT alleged that as to the November, 2010 DDA Portfolio sale, TMT's bid was not accepted because U.S. Bank accepted UCR's bid based on UCR's fraud. Id., p. 55-56. Regarding the DDA Portfolio sale on April 29, 2011, U.S. Bank falsely represented that TMT was not awarded the bid because UCR had a forward flow contract with a 30-day exit clause. Id., p. 56. Absent this false misrepresentation, TMT would have been the successful bidder. Id. Similarly,

TMT would have been the successful bidder on the DDA Portfolio sale in July, 2011, but for U.S. Bank's fraudulent statement that UCR had a "right of first refusal." Id.

TMT also contended that its claims for intentional and negligent misrepresentation as to the September 2011 DDA Portfolio and March 2012 DDA Portfolio were pled with the particularity required by Rule 9(b). Id., pp. 49-53. For example, TMT alleged that between August, 2011 and September 19, 2011, vanBrandwijk represented that the DDA Portfolios were zero-agency debt. Id., pp. 49-50. While U.S. Bank minimized VanBrandwijk's statement regarding whether the September, 2011 DDA Portfolio was a two-agency debt ("whomsoever posted the comment has a problem with the facts"), TMT contended that it was reasonable interpret vanBrandwijk's statement to mean that UCR's statement that the debt was two-agency debt was not accurate, but at any rate, the interpretation of vanBrandwijk's statement was a jury matter. Id., pp. 51-52.

TMT rejected U.S. Bank's argument that it never represented that the March, 2012, DDA Portfolio was zero-agency debt as a basis for dismissing this claim. Id. According to TMT, quality of the debt was not the basis of its misrepresentation claims; rather it had alleged a false representation by vanBrandwijk about UCR's bid price. Id., pp. 52-53. TMT also spurned U.S. Bank's argument regarding the one-year contractual limitations period, noting that it did not allege any breach of contract claims arising out of the March 2012, DDA Portfolio purchase agreement. Id., p. 53.

TMT contended that its unjust enrichment claim was adequately pled because the unjust enrichment complained of fell outside the scope of any contract and was, therefore, not covered by any contract provision. Id., pp. 54-55. TMT's unjust

enrichment claim was premised on U.S. Bank's misrepresentations as to the quality of the DDA and the price at which UCR was bidding, which resulted in TMT overpaying for the DDA Portfolios.  Id., p. 55.

In reply, U.S. Bank submitted that TMT failed to properly plead respondeat superior in connection with its RICO claim.  U.S. Bank Reply Mem., pp. 1-2 [Docket No. 71].  TMT was required to plead that Tate's and vanBrandwijk's purported fraud and bribery served U.S. Bank's corporate policy goals and its failure to do so was fatal.  Id. (citing K & S P'ship v. Continental Bank, N.A., 127 F.R.D. 664, 670 (D. Neb. 1989)).  As to the state claims, vicarious liability for intentional torts requires foreseeability and TMT did not allege that Tate's or vanBrandwijk's conduct was foreseeable.  Id., p. 1. Vicarious liability for negligent torts requires action within the scope of employment and bribery is not within the scope of employment, nor was the bribery foreseeable or authorized.  Id., p. 2.  As a result, U.S. Bank cannot be held liable under a theory of respondeat superior for the RICO claim or any of the state law claims.  Id., p. 2.

U.S. Bank reiterated that TMT's RICO claims failed because TMT alleged that the RICO enterprise consisted solely of the defendants – a fatal error in pleading RICO claims.  U.S. Bank's Reply Mem., p. 2.  Additionally, TMT failed to allege an enterprise distinct from the racketeering activity – another incurable flaw.  Id., pp. 2-3.  U.S. Bank noted that TMT's effort to salvage its RICO claims by stating that the alleged RICO enterprise "undoubtedly" engaged in legitimate DDA sales must be rejected, as these facts were not pled in the Amended Complaint and the only allegations TMT cited in support of these unalleged facts was its conclusory claim of enterprise and pattern of racketeering activity distinctiveness at paragraph 122 of the Amended Complaint.  Id., p.

3.  As to TMT's argument that the statute of limitations on the RICO claims were subject to equitable tolling, U.S. Bank noted that TMT did not plead fraudulent concealment and cannot assert it at this point.  Id., p. 4.

U.S. Bank also rejected TMT's contention that U.S. Bank knew of its "officers'" purported involvement in the RICO scheme, as the Amended Complaint, ¶¶ 184-189, only stated that TMT informed U.S. Bank of Tate's misconduct after he resigned, and there was no factual support for any allegation that vanBrandwijk accepted bribes.  Id., pp. 4-5.

As to the antitrust claims, U.S. Bank noted that the only case cited by TMT in support of its argument that an agreement between a buyer and seller could be deemed horizontal if it affected competitors, Cernuto v. United Cabinet Corp., 595 F.2d 164, 168 (3rd Cir. 1979), was rejected by the United States Supreme Court on this point in Business Elecs. Corp. v. Sharp Elecs Corp., 485 U.S. 717, 730, n. 4 (1988).  Id., pp. 6-7.  TMT never alleged an agreement between U.S. Bank and a U.S. Bank competitor.  Id., p. 7.  Further, while TMT contended that U.S. Bank was in the same business as TMT, UCR and its competitors, (TMT's Mem., p. 37), TMT never pled that U.S. Bank was UCR or TMT's competitor.  Id., p. 7, n. 5.

Because TMT failed to state a federal antitrust claim, its state law antitrust claims also failed.  Id., pp. 7-8.

As for the contract claims, U.S. Bank contended that pursuant to Weibeler v. Milwaukee Mechanics' Mut. Ins., 16 N.W. 363, 363 (Minn. 1883), a contract that can be fully performed and ended within one year falls outside the statute of frauds.  Id., p. 8. Here, the five-year forward flow contract could not have been completed within a year.

Id.  To the extent TMT argued that U.S. Bank should be estopped from asserting the statute of frauds, U.S. Bank noted that TMT did not plead any of the elements of equitable estoppel described by Lunning v. Land O'Lakes, 303 N.W.2d 452, 457 (Minn. 1980).  Id.  Further, TMT's argument that discovery "may well" reveal a writing that satisfied the statute of frauds was insufficient under the Twombly pleading standard. Id., p. 9.

Regarding TMT's misrepresentation claims, U.S. Bank stated that TMT failed to plead reliance on any misrepresentations.  Id.  For example, TMT did not allege that any misrepresentations resulted in its losing out at DDA Portfolio auctions.  Id.  Additionally, TMT claimed it lost auctions due to bribery, not due to reliance on alleged misrepresentations by U.S. Bank.  Id.

As to the contractual limitations period reflected in the March, 2012 purchase agreement, U.S. Bank contended that, contrary to TMT's assertion that it only applied to breach of contract claims and was unenforceable due to fraud, the limitations period facially applied to all actions, "regardless of form."  Id., p. 10 (citing Poley Aff., Ex. C at p. 12, Art. VIII, § G).  As a result, any claims based on this purchase agreement must be dismissed.  Id.

Finally, U.S. Bank argued that the unjust enrichment claim was based on the same alleged misrepresentations as its fraud and RICO claims.  Id., p. 10.  Because those claims constituted actions at law, the equitable claim of unjust enrichment had to be dismissed.  Id.

## II.      STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  In re Operation of Mo. River Sys. Litig., 418 F.3d 915, 917 (8th Cir. 2005) (citations omitted); see also Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).   In addition, "the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint."  Ossman v. Diana Corp., 825 F. Supp. 870, 880 (D. Minn. 1993) (internal quotation marks omitted) (quoting Retail Clerks Int'l Ass'n v. Schermerhorn, 373 U.S. 746, 753 n. 6 (1963)).

Litigants also must properly plead their claims under Rule 8 of the Federal Rules of Civil Procedure and meet the principles articulated by the United States Supreme Court in Bell Atlantic Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009).   To satisfy Rule 8, Twombly and Iqbal, "a complaint need not contain 'detailed factual allegations,' . . . ."   United States ex rel. Raynor v. National Rural Utils. Coop. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012) (quoting Twombly, 550 U.S. at 555).   However, "it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'"   Id. (citation omitted).   The court is not bound to accept as true "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . or legal conclusions couched as factual allegations."   McDonough v. Anoka Cty., 799 F.3d 931, 945 (8th Cir. 2015) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).   Accordingly, to "survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S., at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556).

"Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the claimed violations.  Twombly, 550 U.S. at 556.  "There is no requirement for direct evidence; the factual allegations may be circumstantial and 'need only be enough to nudge the claim 'across the line from conceivable to plausible.'" McDonough, 799 F3d at 945 (quoting Cardigan Mountain Sch. v. New Hampshire Ins. Co., 787 F.3d 82, 88 (1st Cir. 2015) (quoting Twombly, 550 U.S. at 556)).  "Courts should consider whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct, because '[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 678, 682 (quoting Twombly, 550 U.S. at 557, 567 (brackets omitted)) (internal quotation marks omitted).  "If the alternative explanations are not sufficiently convincing, however, the complaint states a plausible claim for relief, because '[f]erreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage.'" Id. (citing Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 458 (6th Cir. 2011)).

As a general rule, the Court may not consider materials "outside the pleadings" on a motion to dismiss. However, "a court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." Wickner v. McComb, 2010 WL 610913, at *5 (D. Minn. 2010) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)).

## III.   DISCUSSION

Before addressing the merits of the motion to dismiss, the Court must first take up the six exhibits U.S. Bank submitted in support of its motion to dismiss. Poley Aff., Exs. A-F. [Docket No. 54] and letters sent to the Court by the parties following the briefing on this motion.

U.S. Bank stated that Exhibits A-D to the Poley Affidavit were "embraced by the pleadings," and submitted Exhibits E and F to the Poley affidavit "not . . . in support of its Motion" but "for purposes of illustration only." U.S. Bank Mem., pp. 30, 32, n.18. U.S. Bank contended that Exhibit E, an email regarding the September, 2011 DDA Portfolio, refuted TMT's allegations that U.S. Bank failed to disclose to TMT that the September, 2011 and March, 2012 DDA Portfolios were two-agency debt before TMT purchased the Portfolios. Id., p. 30. U.S. Bank submitted Exhibit F to show that TMT's allegation that it was not sent any offering materials on the March 8, 2012 DDA Portfolio was "patently false." Id., p. 32, n.18. TMT objected to Poley Aff., Ex. E and submitted the Affidavit of Mark Bugni, a TMT principal, to "provide at least minimal evidence to demonstrate the falsity of certain of U.S. Bank's arguments that purport to be supported

by emails attached to the [Poley Affidavit].   TMT's Mem., pp. 3, n.1, p. 50; Affidavit of

Mark Bugni [Docket No. 62].

Under the motion to dismiss standard, the Court accepts the allegations in the

Amended Complaint as true.   Therefore, the Court will not consider Exhibits E and F to

the Poley Affidavit or the Bugni Affidavit submitted by TMT.   These materials were

submitted to challenge (and prove) the truth of the allegations alleged in the Amended

Complaint.   If the lawsuit proceeds, the parties will be entitled to conduct discovery on

the issue of U.S. Bank's disclosures to TMT of the status of the DDA Portfolios and

submit that issue, if warranted, on a motion for summary judgment.   As to the Poley

Affidavit Exhibits A-D, the Court has considered them because they were embraced by

the pleadings.

On October 19, 2015, TMT's attorney wrote to this Court to inform the Court that

Potillo had pled guilty to bribing Tate and conspiring to commit bribery.   [Docket No. 89].

TMT attached to this letter a copy of Potillo's plea agreement in United States v. Potillo,

Crim. No. 6:14-128-Orl-28GJK [Docket No 101], Magistrate Judge Gregory Kelly's

Report and Recommendation to the District Court, Middle District of Florida,

recommending that the plea be accepted [Docket No. 109], and the registration and a

certificate from the Ohio Secretary of State's office regarding an Ohio LLC – Drake Tate

Enterprises, LLC – that Tate apparently had established as part of the bribery scheme.

Id.   All of these documents appear to be part of the public record.   However, TMT's

counsel's letter to the Court enclosing these documents also contained additional,

unauthorized argument opposing U.S. Bank's Motion to Dismiss and stated that "if need

be" TMT would amend its Amended Complaint to incorporate some of the information from the plea agreement that TMT argued bolstered its RICO and antitrust claims.  Id.

In response to TMT's letter, U.S. Bank wrote to the Court on October 22, 2015, and argued that the evidence TMT had submitted was not new or germane to the Court's decision on its Motion to Dismiss.  [Docket No. 90].  U.S. Bank's letter also contained additional, unauthorized argument.  Id.

Both letters constituted unauthorized briefs in violation of Local Rule 7.1(i), which states "[e]xcept with the court's prior permission, a party must not file a memorandum of law except as expressly allowed under LR 7.1."  The Court will take judicial notice of Potillo's plea agreement, the Magistrate Judge's Report and Recommendation, and the filing from the Ohio Secretary of State's Office, all of which are publically filed documents and embraced by the facts as alleged by the Amended Complaint.  See Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697, n.4 (8th Cir. 2003) ("[I]n considering a motion to dismiss, the district court may sometimes consider materials outside the pleadings, such as materials that are necessarily embraced by the pleadings and exhibits attached to the complaint.") (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999)); Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007) ("In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) the court is not precluded in [its' review of the complaint from taking notice of items ion the public record.") (quotation and citation omitted).  As for the arguments reflected in the parties' letters, the Court does not condone these filings.  Nonetheless, it reviewed and considered them.

**A.**   **Civil RICO Claim (Counts One and Two Against U.S. Bank, UCR, Tate, Potillo, and vanBrandwijk)**

The U.S Bank defendants moved to dismiss the civil RICO claims against U.S. Bank and vanBrandwijk, on the following grounds.  First, U.S. Bank claimed that TMT failed to plead a RICO enterprise distinct from the defendants.  U.S. Bank's Mem., pp. 8-9.  Pursuant to Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001), a plaintiff must allege the existence of two distinct entities: (1) a "person" and (2) an "enterprise."  Id., p. 8.  Here, TMT alleged that Tate, Potillo, vanBrandwijk, UCR, and U.S. Bank were "RICO persons," and then alleged that these "RICO persons" associated as a "RICO enterprise."  Amended Complaint, ¶¶ 112, 113.  TMT failed to offer any facts to support the existence of a RICO enterprise separate from the U.S. Bank defendants and thus, failed to adequately plead a required element of a RICO claim.  Id., p. 9.

Second, U.S. Bank asserted that a RICO claimant must assert the existence of an association-in-fact enterprise with "'an ascertainable structure distinct from the conduct of a pattern of racketeering.'"  Id. (quoting United States v. Lee, 374 F.3d 637, 647 (8th Cir. 2004)).  The test for distinctness is whether the enterprise would still exist without the predicate acts.  Id. (citation omitted).  Here, TMT stated only that "the enterprise did not exist solely to engage in the predicate acts and pattern of racketeering," (Amended Complaint, ¶ 122), a "formulaic recitation" that did not meet Rule 8 pleading standards.  Id., pp. 9-10.  Similarly, TMT's conclusory statement that the enterprise "conducted other business wholly separate and apart from the pattern of racketeering activity" was unsupported by any facts.  Id., p. 10.

Third, U.S. Bank argued that TMT's RICO claims were barred by the governing four-year statute of limitations.  Id., p. 10.  RICO claims accrue when the facts constituting fraud were or by reasonable diligence should have been discovered.  Id. (citation omitted).  According to U.S. Bank's calculations, TMT filed its initial complaint on November 7, 2014, and therefore, if it knew or should have known of its injury before November 7, 2010 (the "cutoff date"), then its entire RICO claim was time-barred.  Id., p. 11.  U.S. Bank pointed to two instances that established that TMT had notice of its RICO injury before the cutoff date.   The first instance was Paragraph 39 of the Amended Complaint, which referenced an email from TMT's president, Mark Bugni, informing U.S. Bank that Potillo and UCR were engaged in bribery to purchase U.S. Bank DDA Portfolios.  Id., p. 12.  In this email dated April 11, 2011, Bugni stated:

> Also, as I have told Todd [Loosbrock] previously, Len Pontillo [sic] contacted my old boss 4 years ago at (IDT Carmel) trying to pay him off so that our old company would not bid on U.S. Bank DDA.  Needless to say, we never got the bid?????.  At that time, 4 years ago, our bid was 4 cents. I would be interested to see what the portfolio was going for then since we somehow did not get it.  This bid price was verbally offered to Bill Tate, which I witnessed!

Poley Aff., Ex. A, p. 2.  According to U.S. Bank, this statement by Bugni showed that TMT was aware of the RICO scheme in 2007 (i.e. by referencing "4 years ago"), over three years before the cutoff date.  U.S. Bank's Mem., p. 12.

The second instance arose out of TMT's allegation that it learned in August, 2010 (three months before the statute of limitations cutoff date) that UCR was bidding substantially less than TMT for DDA.  Id., p. 13 (citing Amended Complaint, ¶ 24).  As a result, "a reasonable person in TMT's position would question why it was not winning

the DDA auctions upon learning that it was 'substantially' outbidding the winning bidder, UCR." Id.

Fourth, U.S. Bank alleged that the portion of the RICO claim that was based on the March, 2012 purchase agreement was barred by the one-year statute of limitations in the agreement. Id. (citing Poley Aff., Ex. C (March 15, 2012 purchase agreement between U.S. Bank and TMT at Article VIII, ¶ G (stating "[n]o cause of action, regardless of form, shall be brought by either party more than one (1) year after the cause of action arises.")). Therefore, if any of TMT's claims relating to the March, 2012 transaction accrued on or before November 7, 2013, (the one-year contractual cutoff date), then those claims are time-barred. Id., p. 14. In support, U.S. Bank pointed to TMT's admission that it learned Tate was taking bribes from UCR shortly after November 23, 2010. Id. (citing Amended Complaint, ¶ 33). Additionally, TMT knew about the alleged RICO scheme as early as April, 2007 (based on Bugni's e-mail).

Fifth, TMT did not plead facts to support U.S. Bank's involvement in the RICO scheme. Id., pp. 14-16. Potillo's indictment, on which the RICO claim is primarily based, (Amended Complaint, Ex. C), did not implicate U.S. Bank or even mention vanBrandwijk. Id., p. 15. Moreover, to impose vicarious liability on U.S. Bank for Tate and vanBrandwijk's actions, TMT was required to allege that they were serving U.S. Bank's corporate policy goals, which it failed to do. Id. Additionally, TMT's allegation that it successfully purchased two DDA portfolios was inconsistent with its allegation that U.S. Bank was involved in a scheme to exclude other DDA buyers; likewise, TMT did not explain why U.S. Bank would use an open auction system to exclude other buyers, rather than a private sale to UCR. Id., p. 16.

Finally, U.S. Bank argued that the RICO conspiracy claim failed because its underlying RICO claim failed.  Id. (citing Jaworski v. Rollupspacovers, Civ. No. 11-1816 (DSD/JSM), 2012 WL 1130684, at *3 (D. Minn. Apr. 3, 2012) (dismissal of claim for conspiracy to violate RICO warranted when substantive RICO claim failed)).

TMT responded that the association-in-fact enterprise in the instant case was comprised of U.S. Bank, its two officers (vanBrandwijk and Tate), UCR and Potillo.  TMT's Mem., p. 13.  According to TMT, U.S. Bank's argument amounted to a legally unsupported position that a bank could never be a RICO person that conducted or participated in the affairs of an association-in-fact enterprise comprised of the bank, its officers and unrelated third parties, without violating the requirement that the RICO enterprise be distinct from the RICO person/defendant.  Id., p. 14.  TMT contended that U.S. Bank was a "separate legal entity" distinct from the association-in-fact enterprise and, therefore, it met the requirement for distinctiveness between RICO persons and the RICO enterprise.  Id., pp. 12-14.

TMT acknowledged that an enterprise must exist separate from the pattern of racketeering activity.  Id., p. 15.  TMT argued that in this case, the enterprise engaged in conduct distinct from and apart from the predicate acts of racketeering in that it also existed to organize and oversee acts distinct from the pattern of racketeering, such as acts necessary to close sales, obtain closing proceeds, and provide post-sale services.  Id., p. 17.  TMT further claimed that the association-in-fact enterprise "undoubtedly" engaged in legitimate sales of DDA Portfolios.  Id.

In sum, TMT argued that the association-in-fact enterprise was separate and distinct from the pattern of racketeering activity because U.S. Bank would have

engaged in legitimate activity in connection with the DDA Portfolio sales as well as illegal activities, which were part of pattern of racketeering activities.  According to TMT, it has described sufficient facts to raise a reasonable expectation that discovery will reveal evidence that the enterprise engaged in legitimate as well as illegal activity.  Id., p. 18.

TMT denied that its claims were barred by the governing four-year statute of limitations, stating that the email on which U.S. Bank relied did not show that TMT was aware of the RICO scheme four years before filing the Complaint.  Id., p. 20.  The email merely showed that Potillo tried to bribe a competitor of the former employer of TMT's principal.  Id.  Nothing in the email indicated that TMT knew or had reason to know that Potillo was bribing a U.S. Bank officer years later.  Id.  As to U.S. Bank's argument regarding TMT's knowledge in August, 2010, that UCR was bidding substantially less for the DDA Portfolios that TMT's offers, TMT noted that it only learned of this through Tate.  Id.  In light of the fact that it was a U.S. Bank officer providing the information, there was no reason why TMT should have been tipped off that Tate and others were bring bribed.  Id., pp. 20-21.  Moreover, there are ample facts alleged to support equitable tolling of the statute of limitations, as there was evidence that U.S. Bank concealed its bribery from TMT by stringing it along with false explanations regarding why TMT was not being injured through its inability to succeed in its DDA Portfolio bids.  Id., p. 21.

In reply, U.S. Bank reiterated that TMT's RICO claims failed because TMT alleged that the RICO enterprise consisted solely of the defendants – a fatal pleading error.  U.S. Bank's Reply Mem., p. 2.  Additionally, TMT failed to allege an enterprise

distinct from the racketeering activity – another fatal error. Id., pp. 2-3. U.S. Bank noted that TMT's effort to salvage its RICO claims by stating that the alleged RICO enterprise "undoubtedly" engaged in legitimate DDA sales failed, as it was not pled in the Amended Complaint, and the only allegations TMT cited in support of these unalleged facts was its conclusory claim of enterprise and distinctiveness of pattern of racketeering activity at paragraph 122 of the Amended Complaint. Id., p. 3. As to TMT's argument that the statute of limitations on the RICO claims were subject to equitable tolling, U.S. Bank noted that TMT did not plead fraudulent concealment and cannot assert it at this point. Id., p. 4.

U.S. Bank rejected TMT's contention that U.S. Bank knew of its "officers" purported misconduct, as paragraphs 184-189 of the Amended Complaint only stated that TMT informed U.S. Bank of Tate's misconduct after he resigned, and there was no factual support for any allegation that vanBrandwijk accepted bribes. Id., p. 5.

In its unsolicited letter brief to the Court, TMT contended that the fact that Tate wired his bribe funds to the bank account of Drake Tate Enterprises, LLC was evidence that "the RICO enterprise would be separate and distinct from the RICO defendants because Drake Tate Enterprises, LLC – which we now know was an important member of the enterprise – is not a defendant." Letter to Court from TMT dated October 19, 2015, p. 2. TMT stated that "if need be," it would seek leave to amend to add these facts to a Second Amended Complaint, but also argued that there was no need to amend the Amended Complaint on this point because it had already alleged a RICO enterprise separate from the RICO defendants. Id., n.1. According to TMT, the fact that all defendants comprised the association-in-fact enterprise did not "detract from the fact

that the enterprise can be a separate and distinct entity." Id. (citing Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256 (2d Cir. 1995); Shearin v. E.F. Hutton, 885 F.2d 1162 (3d Cir. 1989); River City Markets v. Fleming, 960 F.2d 1458 (9th Cir. 1992)).

U.S. Bank responded in its unsolicited letter brief to the Court that TMT should not be allowed to amend the Amended Complaint to add facts regarding Drake Tate, LLC because any such amendment would be futile. Letter to Court from U.S. Bank dated October 22, 2015, pp. 1-2. According to U.S Bank, Drake Tate Enterprises, LLC, which was organized eight days before Tate received his first bribe, would necessarily be deemed a RICO "person." Id., p. 2, n.2. Therefore, even if TMT named Drake Tate Enterprises, LLC as a member of the alleged RICO enterprise, there would still be no distinction between the alleged RICO persons and the RICO enterprise. Id. As for TMT's citation of Securitron Magnalock Corp., Shearin, and River City Markets in support of its positon that a RICO violation can be maintained even though the defendants and enterprise-in-fact are the same, U.S. Bank maintained that those cases pre-dated the Supreme Court's decision in Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001), which set forth the requirement for distinction between RICO persons and the enterprise-in-fact. Id., p. 1, n.1.

### 1.    Requisites of a Civil RICO Claim

The Racketeer Influenced and Corrupt Organizations Act ("RICO") prohibits persons "employed by or associated with any enterprise engaged in. . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(a) (2012). RICO "defines 'racketeering activity' as the commission of any of several

predicate offenses." <u>Illinois Farmers Ins. Co. v. Mobile Diagnostic Imaging, Inc.</u>, Civ. No. 13-2820 (PJS/TNL), 2014 WL 4104789, at *6 (D. Minn. Aug. 19, 2014) (citing 18 U.S.C. § 1961(1)).   Mail fraud and wire fraud are predicate offenses.   <u>Id.</u> (quoting 18 U.S.C. § 1341 (mail fraud statute), <u>id.</u> § 1343 (wire fraud statute)).   RICO does not encompass all instances of wrongdoing, but "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." <u>Crest Constr. II, Inc. v. Doe</u>, 660 F.3d 346, 353 (8th Cir. 2011).   RICO provides a civil remedy for any person injured in his business or property by reason of a violation of the law's substantive provisions. <u>See</u> 18 U.S.C. § 1964(c).

To plead a viable RICO claim, a plaintiff must allege: "(1) the conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." <u>Crest Constr. II</u>, 660 F.3d at 353 (quotation omitted).

A RICO enterprise "'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated, in fact, although not a legal entity.'" <u>Id.</u> at 354 (quoting 18 U.S.C. § 1961(4)).   "An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." <u>Boyle v. United States</u>, 556 U.S. 938, 946 (2009) (finding that a jury instruction containing these three structural features was correct and adequate).   "Under longstanding Eighth Circuit precedent, an alleged RICO enterprise must also have 'an ascertainable structure distinct from the conduct of a pattern of racketeering.'" <u>Ill. Farmers</u>, 2014 WL 4104789, at *14 (citing <u>Crest Constr. II</u>, 660 F.3d at 354, quoting <u>Lee</u>, 374 F.3d at 647).

TMT claimed that collectively, UCR, Potillo, U.S. Bank, Tate and vanBrandwijk comprised an association-in-fact enterprise "for the common purpose of overseeing and participating in the sale of U.S. Bank DDA Portfolios." Amended Complaint, ¶ 113. For the reasons described below, the Court has concluded that TMT did not adequately plead a RICO claim or a RICO conspiracy.

a.   Person-Enterprise Distinction

TMT did not plead a RICO enterprise distinct from the defendants. The Amended Complaint described Tate, vanBrandwijk, Potillo and UCR as "RICO persons." Amended Complaint, ¶ 112. TMT also named U.S. Bank a "culpable RICO person given that Tate, vanBrandwijk and Hartnack were high-level officers of U.S. Bank," U.S. Bank acted through these individuals, and U.S. Bank acted with knowledge of the criminal conduct and scheme of fraud. Id. The Amended Complaint then defined the RICO enterprise as the "RICO persons" who "associated in fact as a RICO enterprise." Id., ¶ 113. Further, the RICO persons "associated in fact for the common purpose of overseeing and participating in the sale of U.S. Bank DDA Portfolios" and U.S. Bank and these individuals "associated together to cause U.S. Bank DDA Portfolios to be sold to UCR – and only UCR – so as to enrich all members of the enterprise." Id., ¶¶ 113, 120. Elsewhere in the Amended Complaint, TMT alleged that all of the RICO persons committed the predicate acts and engaged in racketeering activities, reinforcing the concept that the RICO persons and association-in-fact enterprise were identical. Under Kushner, these allegations do not meet the required distinction between RICO persons and the enterprise. Zavala v. Walmart Stores, Inc., 447 F. Supp. 2d 379, 383-84 (D. N.J. 2006) (dismissing RICO claim with prejudice on a

Rule 12(b)(6) motion for failure to plead distinction between RICO persons and RICO enterprise and noting that "[t]his pleading failure is not an omission that can be remedied by amendment; rather, it is woven into the fabric of the Second Amended Complaint, and could not be removed without restructuring the entire RICO theory." It was a "serious, fatal problem" to allege that the RICO person and RICO enterprise were the same); <u>Okaya (U.S.A.), Inc. v. Denne Indus., Inc.</u>, Civ. No. 00-1203, 2000 WL 1727785, at *2, 4-5 (N.D. Ill. Nov. 20, 2000) (dismissing civil RICO claims on a Rule 12(b)(6) motion for failure to plead RICO enterprise-person distinction and noting that the complaint stated that the defendants were both RICO persons and the RICO "association in fact" that made up the purported enterprise).

As a result of TMT's failure to plead a RICO person distinct from the RICO association-in-fact enterprise, its RICO claim fails.

b.  <u>RICO Enterprise-Pattern of Racketeering Activity Distinction</u>

Even assuming that TMT had adequately pled the requisite distinction between the RICO association-in-fact enterprise and the RICO persons, its RICO claim fails for the alternative reason that TMT failed to allege a RICO enterprise separate and distinct from the pattern of racketeering activity. A RICO enterprise requires that the common activities of the enterprise extend beyond the minimal association necessary to sustain the pattern of racketeering. <u>Diamonds Plus, Inc. v. Kolber</u>, 960 F.2d 765, 770 (8th Cir. 1992) ("The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense."). "[A]n enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." <u>Stephens, Inc. v. Geldermann</u>, Inc., 962 F.2d 808, 815

(8th Cir. 1992) (citation omitted) (holding that plaintiff insufficiently pled a RICO enterprise because although "each member of th[e] group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise, and thus, were not acts of the enterprise").   That each member of a group carries on activities distinct from the pattern of racketeering is insufficient; <u>the group as a whole must have a common link other than the racketeering activity</u>. <u>McDonough v. National Home Ins. Co.</u>, 108 F.3d 174,177 (8th Cir. 1997) (citations omitted) (emphasis added).   "Proof the enterprise conducts lawful activity unrelated to the pattern of racketeering will often serve to prove the enterprise is separate from the pattern of racketeering."   <u>Diamonds Plus, Inc.</u>, 960 F.2d at 770, 770 n. 5 (citations omitted).   "In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity," the court must "determine if the enterprise would still exist were the predicate acts removed from the equation." <u>Crest Constr. II</u>, 660 F.3d at 354-55 (quoting <u>Handeen v. Lemaire</u>, 112 F.3d 1339, 1352 (8th Cir. 1997)).   Here, the predicate acts alleged are the 60-plus examples of mail fraud and wire fraud alleged in the Amended Complaint.  Amended Complaint, ¶ 154.

The Amended Complaint stated summarily, and without any factual support, that "the enterprise and its members conducted other business wholly separate and apart from the pattern of racketeering activity."  Amended Complaint, ¶ 122.  This allegation does not satisfy Rule 8 of the Federal Rules of Civil Procedure.  In response to U.S. Bank's motion to dismiss, TMT stated (again, without any factual support in its Amended Complaint) that the association-in-fact enterprise conducted the commission of the predicate acts, but also "acts necessary to close sales, obtain closing proceeds,

and provide post-sale services (e.g. providing bills of sale, U.S. Bank affidavits of correctness/assignment, and records relating to loans sold.)." TMT Mem., p. 17. Not only were these facts not pled, but most critically, even if they had been alleged, these activities would be construed as legitimate business activities of one member of the association-in-fact enterprise – U.S. Bank – but not the association-in-fact enterprise itself, which included Potillo and UCR.

As the Eighth Circuit noted in Crest Constr. II, where "the only common factor that linked" the individually named defendants "and defined them as a distinct group was their direct or indirect participation" in a scheme to defraud the plaintiff, plaintiff had not adequately pled a RICO enterprise. 660 F.3d at 355 (citing Stephens, 962 F.2d at 815-16).

In Stephens, the Eighth Circuit found that while each member of the alleged enterprise also carried on other legitimate activities, these other activities were not in furtherance of the common enterprise and were not, therefore, acts of the enterprise. Id. The same is true here. The only activities that allegedly brought U.S. Bank, vanBrandwijk, Tate, Potillo and UCR together was the commission of the predicate RICO acts. See, e.g., Amended Complaint, ¶¶ 124-128, 130-132, 147-154. The fact that U.S. Bank, vanBrandwijk and Tate may have carried on legitimate business separate activities from the alleged enterprise is inadequate to establish distinction between the enterprise and the pattern of racketeering. Absent the predicate acts of wire and mail fraud, the association-in-fact enterprise in this case had no structure and it conducted no other activities together as an enterprise-in-fact. For all of these reasons, the Court concludes that the Amended Complaint fails to plead the requisite distinction

between the enterprise and the pattern of racketeering distinction.  Stephens, 962 F.2d at 816 (noting that absent the predicate acts of wire and mail fraud, the association-in-fact enterprise had no form or structure and if the predicate acts were removed "the alleged association-in-fact enterprise evaporates.").

### 2.      Repleading to Add Drake Tate Enterprises, LLC

Repleading to add Drake Tate Enterprises, LLC, as suggested by TMT, does not solve the pleading defects in the RICO counts.  Letter to Court dated October 19, 2015 from TMT, p. 2.  The plea agreement stated that Potillo would pay Tate for information by making payments via wire transfer to the bank account of a company set up by Tate. Id., Ex. A, p. 26.  The plea agreement does not identify this company as "Drake Tate Enterprises, LLC," but the Court accepted TMT's representation that this was the case for the purpose of its analysis.  Letter to Court dated October 19, 2015, p. 2.  TMT has not identified any purpose for this company other than to receive the bribe payments – as the Amended Complaint noted, the address of Drake Tate Enterprises, LLC was Tate's home address and Tate was listed as the statutory agent.  Amended Complaint, ¶ 94.  Even assuming that the company had some legitimate purpose (although none has been identified), what binds Drake Tate Enterprises, LLC to the already-named RICO defendants are the predicate acts of the RICO scheme, specifically, the wire transfer of the bribe payments from Potillo to Tate, which were routed to the bank account of Drake Tate Enterprises, LLC.  Letter to Court dated October 19, 2015 from TMT, Ex. A, p. 26.  Therefore, even if TMT amended its Amended Complaint to add Drake Tate Enterprises, LLC, there would still not be any distinction between the RICO association-in-fact enterprise and the pattern of racketeering activity, because Drake

Tate Enterprises, LLC would merely be another member of the association-in-fact enterprise.

### 3.    RICO Statute of Limitations

The Court rejected U.S. Bank's arguments in favor of dismissal based on the four-year statute of limitations.  U.S. Bank Mem., pp. 12-13.  Civil RICO claims are governed by a four-year statute of limitations.  See Association of Commonwealth Claimants v. Moylan, 71 F.3d 1398, 1402 (8th Cir. 1995).  The statute of limitations can be tolled if the plaintiff is able to show that there was fraudulent concealment of the violation and that the plaintiff exercised due diligence to discover the claim.  Klehr v. A.O. Smith Corp., 521 U.S. 179, 194–95 (1997).  The email from Bugni dated April 11, 2011, on which U.S. Bank relied, was insufficient to show that TMT was aware of Potillo's bribery of Tate more than four years before the Complaint was filed.  See Poley Aff., Ex. A.  The Amended Complaint alleged that TMT learned that Tate was accepting bribes from UCR after November 23, 2010, and the Complaint was filed on November 7, 2014, within the statute of limitations.  All that the Bugni email showed was that TMT's President Bugni had reported to U.S. Bank that Potillo had contacted Bugni's former boss at IDT Carmel in 2007 "trying to pay him off" so that IDT Carmel would not bid on U.S. Bank DDA Portfolios.  The email does not support U.S. Bank's statements that TMT was "aware of the alleged RICO scheme" over three years before the statute of limitations cutoff date.  U.S. Bank Mem., p. 12; U.S. Bank Reply, p. 4.[9]

---

[9]      Having concluded that the RICO claims were timely (although insufficiently pled), the Court need not address TMT's argument that that there was ample evidence to support tolling of the statute of limitations.  TMT's Mem., p. 21.  However, the Court does note that the case cited by U.S. Bank for the proposition that equitable tolling based on fraudulent concealment had to be pled with particularity in the complaint is

The Court rejects U.S. Bank's argument that TMT's allegation that it had learned in August 2010, three months before the date the 4-year statute of limitations began to run, that UCR was bidding substantially less for U.S. Bank DDA Portfolio than TMT, somehow triggered the running of the statute of limitations.  U.S. Bank Mem., p. 13 (citing Amended Complaint, ¶ 24).  While it is possible, as U.S. Bank argued, that a reasonable person in TMT's shoes may have questioned why UCR was winning bids based on lower bid amount, that is a far cry from knowing of an alleged RICO injury sufficient to prompt the running of the RICO statute of limitations.

### 4.    One-Year Contractual Statute of Limitations

This Court rejects U.S. Bank's argument that TMT's claims based on the March, 2012 DDA Portfolio purchase agreement were barred by the one-year contractual limitation clause found in that agreement.  U.S. Bank Mem., pp. 13-14.  To begin with, the Amended Complaint (or any other claims, for that matter) do not allege a breach of contract related to its bid on the March, 2012 DDA Portfolio.  Moreover, TMT asserted that it "had no such claims."  TMT's Mem., p. 22.  For those reasons, any suggestion by U.S. Bank that the contractual limitations period in the March, 2012, purchase agreement governs any RICO claim by TMT fails.

---

distinguishable.  U.S. Bank's Reply Mem., p. 4 (citing Summerhill v. Terminex, 637 F.3d 877, 880 (8th Cir. 2011)).  In Summerhill, the claims were clearly time-barred and the court determined that it was plaintiff's burden to plead tolling based on fraudulent concealment with particularity.  637 F.3d at 880.  Normally, a statute of limitations is an affirmative defense, which it is a defendant's burden to plead and prove.  John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 753 (2008).  Therefore, the possible existence of a statute of limitations defense is not ordinarily a ground for dismissal under Fed. R. Civ. P. 12(b)(6), "unless the complaint itself establishes the defense."  Jessie v. Potter, 516 F.3d 709, 715, n.2 (8th Cir. 2008) (citing Varner v. Peterson Farms, 371 F.3d 1011, 1017-18 (8th Cir. 2004)).  Here, there is nothing obvious about the facts alleged in the Amended Complaint that brings the RICO claims outside the statute of limitations.

### 5. Conspiracy to Violate RICO

Having concluded that TMT failed to state a civil RICO claim against U.S Bank and vanBrandwijk, the Court recommends that Count Two, Conspiracy to Violate RICO (against all defendants except Hartnack), be dismissed against these defendants. See Jaworski, 2012 WL 1130684, at *3 (noting that although the Eighth Circuit has not directly addressed the issue, "other courts have determined that [a]ny claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.") (citation omitted) (collecting cases).

### 6. Dismissal of the RICO Claims With Prejudice

"Ordinarily dismissal of a [pleading] for failure to comply with Rule 8 should be with leave to amend." Michaelis v. Nebraska State Bar Ass'n., 717 F.2d 437, 438–39 (8th Cir. 1983). Nonetheless, when a complaint is so deficient or defective that the court is convinced that its defects cannot be cured through re-pleading, dismissal with prejudice is appropriate. Sellors v. Obama, Civ. No. 13-2484 (SRN/JSM), 2014 WL 1607747, at *14 (D. Minn. April 15, 2014) (Order overruling objections to Report and Recommendation that recommended dismissal of an amended complaint with prejudice due to incurable pleading defects); McLean v. United States, 566 F.3d 391, 400–401 (4th Cir. 2009) ("to the extent ... that a district court is truly unable to conceive of any set of facts under which a plaintiff would be entitled to relief, the district court would err in designating [a] dismissal to be without prejudice. Courts, including this one, have held that when a complaint is incurable through amendment, dismissal is properly rendered with prejudice and without leave to amend."); McKesson HBOC, Inc. v. New York State

Common Ret. Fund, Inc., 339 F.3d 1087, 1096 (9th Cir. 2003) (dismissal with prejudice is appropriate where "deficiencies in [plaintiff's] claims cannot be cured by amendment").

Here, the allegedly offending conduct by U.S. Bank and vanBrandwijk did not amount to a violation of RICO.  Consequently, even if TMT could plausibly allege acts constituting fraud by these defendants, it cannot plead, much less show, an enterprise with an ascertainable structure, different from that inherent in a pattern of racketeering activity.  Therefore, any attempt to amend the Amended Complaint to assert a viable RICO claim is futile, and the Court recommends that U.S. Bank's motion to dismiss as to the RICO claim should be granted and the claim be dismissed with prejudice.

### B.    Antitrust Claim (Count Three Against UCR and U.S. Bank)

TMT alleged that UCR and U.S. Bank violated § 1 of the Sherman Act, 15 U.S.C. § 1.  Amended Complaint, ¶¶ 168-172.  According to TMT, UCR and U.S. Bank's price fixing scheme was a per se violation of the Sherman Act.  Id., ¶¶ 169-170.

"To demonstrate a violation of section 1 of the Sherman Act, a plaintiff must provide proof of an illegal contract, combination, or conspiracy which results in an unreasonable restraint of trade."  Double D. Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 558 (8th Cir. 1998); Regional Multiple Listing Serv. of Minn. v. Am. Home Realty Network, Inc., 960 F.Supp.2d 958, 979 (D. Minn. 2013) ("To establish a claim under Section 1 of the Sherman Act, a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) the restraint affected interstate commerce.").  The United States Supreme Court has repeatedly

recognized that by the language of the Sherman Act, "'Congress intended to outlaw only underline restraints.'" Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) (emphasis in original).

A violation of § 1 alone is insufficient to support a civil lawsuit for restraint of trade. The Clayton Act, 15 U.S.C. § 15, defines the class of persons who may "maintain a private damage action under the antitrust laws." Associated Gen. Contractors of Cal., Inv. v. California State Council of Carpenters, 459 U.S. 519, 529 (1983). Pursuant to § 15(a), "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States." In Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., the Supreme Court held that § 15(a) creates an additional element for a civil claim based upon an alleged antitrust violation. A plaintiff must prove more than injury causally linked to an illegal presence in the market. Instead, a plaintiff must prove antitrust injury – that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." 429 U.S. 477, 489 (1977); see also Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 109-110 (1986) (summarizing Brunswick Corp.). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993); see also Associated Gen. Contractors of Cal. 459 U.S. at 537 (noting that an "allegation of improper motive, although it may support a plaintiff's

damages under § 4 [of the Clayton Act] is not a panacea that will enable any complaint to withstand a motion to dismiss.").

Most antitrust claims are analyzed under the "rule of reason," where the fact finder determines whether the practice complained of is an unreasonable restraint on competition based on a number of factors, such as specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect. State Oil v. Khan, 522 U.S. 3, 10 (1997) (citations omitted).  Under the rule of reason analysis, "[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.  To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 n.15 (1977) (citation omitted).  The rule of reason is the presumptive or default standard and requires the antitrust plaintiff to "demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." Dagher, 547 U.S. at 5.  To state a claim under the rule of reason, a plaintiff must allege concerted action intended to harm or unreasonably restrain competition and that actually injures competition. Five Smiths, Inc. v. National Football Players Ass'n., 788 F. Supp. 1042, 1051 (D. Minn. 1992).  A plaintiff must further allege a relevant market that has been adversely affected by the challenged restraint. Id. (citation omitted).  The failure to adequately plead a relevant market is grounds for dismissal of a rule of reason claim. Id. (citations omitted).

TMT did not plead an antitrust violation under the rule of reason. Instead, TMT alleged that "UCR and U.S. Bank contracted, engaged in concerted action and conspired together in a manner which unreasonably restrained trade and restricted competition, all with an effect on interstate commerce" by conspiring to fix the price at which DDA Portfolios would be sold to UCR, fix UCR's bid prices and refuse to deal with TMT, and conspiring to ensure that "no parties such as TMT" could successfully bid on DDA Portfolios. Amended Complaint, ¶ 169. According to TMT, this conduct constituted a per se violation of the Sherman Act. Id., ¶ 170; TMT's Mem., p. 41.

"Some types of restraints . . . have such predictable and pernicious anticompetitive effect and such limited potential for procompetitive benefits, that they are deemed unlawful per se." State Oil, 522 U.S. at 10 (citation omitted); Regional Multiple Listing Serv. of Minn., 960 F. Supp. 2d at 983 ("Certain kinds of agreements, however, are considered unlawful per se because they are of a type that is so often harmful and so rarely justified that proof of anti-competitiveness is not required.") (quotation omitted). Such restraints "'are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co., 472 U.S. 284, 289 (1985) (quoting Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958)). Per se treatment is proper only "[o]nce experience with a particular kind of restraint enables the [c]ourt to predict with confidence that the rule of reason will condemn it." Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344 (1982). "[A] 'departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing.'" Leegin

Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 887 (2007) (second alteration in original) (quoting Continental T.V., Inc., 433 U.S. at 58–59).   To justify a per se violation, a challenged practice must have "manifestly anticompetitive" effects and lack "any redeeming virtue."   Id. at 886.   (internal quotation marks omitted).   The Supreme Court has "'expressed reluctance to adopt per se rules where the economic impact of certain practices is not immediately obvious.'"   Dagher, 547 U.S. at 5 (quotation marks and ellipses omitted) (quoting State Oil, 522 U.S. at 10).   Practices that have been found to be per se illegal include price-fixing, division of markets, group boycotts, and tying arrangements.[10]   Double D. Spotting, 136 F.3d at 558 (citations omitted).

To determine whether an alleged restraint is unreasonable, the court must decide initially whether it is per se illegal or whether it must be analyzed under the rule of reason.   Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1155 (9th Cir. 2003). The purpose of both analyses is to "form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry.   Subject to exceptions defined by statute, that policy decision has been made by the Congress."   National Soc. of Professional Engineers v. United States, 435 U.S. 679, 692, 637 (1978).   "Under the Sherman Act the criterion to be used in judging the validity of a restraint on trade is its impact on competition."   National Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 104 (1984).   In other words, regardless of whether a plaintiff pleads an antitrust claim as a per se violation, or a violation under the rule of reason, the court

---

[10]   A tying arrangement is defined "as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."   Northern Pac. Ry. Co., 356 U.S. at 5-6.

must make a threshold determine that the alleged injury falls within the scope of the Sherman Act.

The Supreme Court had described a horizontal restraint of trade as a "naked restraint [ ] of trade with no purpose except stifling of competition." United States v. Topco Assocs., 405 U.S. 596, 608 (1972). The classic horizontal restraint involves an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. Id.; Double D. Spotting, 136 F.3d at 558 ("Horizontal restraints of trade result when combinations of traders at one level of the market structure agree to exclude direct competitors from the same level of the market.") (citation omitted). Horizontal restraints are per se illegal. Topco Assocs., 405 U.S. at 608 (citations omitted). A plaintiff alleging a horizontal restraint must "at least define the market and its participants." Double D. Spotting, 136 F.3d at 559. "If an alleged restraint falls within the category of restraints subject to per se analysis, a plaintiff need not prove its anticompetitive effects." Flegel v. Christian Hosp., Ne.-Nw., 4 F.3d 682, 686 (8th Cir. 1993).

Vertical restraints of trade result from agreements among "combinations of persons at different levels of the market structure, e.g., manufacturers and distributors." Topco Assocs., 405 U.S. at 608. Vertical minimum price restrictions are generally per se antitrust violations. Double D. Spotting, 136 F.3d at 559 (citation omitted).

In support of its contention that it properly pled a per se violation of the Sherman Act, TMT argued that U.S. Bank and UCR were engaged in a horizontal restraint of trade because UCR, through its bribery and bank fraud scheme cut TMT out of the market and also cut out all other potential UCR competitors. TMT's Mem., p. 31. TMT

contended that UCR and U.S. Bank's relationship was only facially vertical. Id., p. 30. In fact, UCR controlled U.S. Bank's actions through bribery and "allocated its product ... between competing customers in a given horizontal market and effectively destroyed competition between them." Id., p. 34. TMT relied heavily on American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230 (3rd Cir. 1975), in support of its contention that although facially vertical, the relationship between U.S. Bank and URC was actually horizontal. TMT submitted that pursuant to American Motor Inns, where a party to a facially vertical relationship (there, Holiday Inns) allowed its franchisees to have veto power over granting new franchises to competitors, that was sufficient to infer a per se illegal horizontal restraint of trade. Id., p. 33. TMT argued that like American Motor Inns, U.S. Bank's decisions regarding sale of the DDA Portfolios was not independent, but was controlled by UCR and "allocated its product (DDA Portfolios) between competing customers in a given horizontal market and effectively eliminated all competition between them." Id.

After carefully reviewing the allegations in the Amended Complaint, as well as TMT's unsolicited letter brief and attachments, the Court recommends dismissal of Count Three with prejudice. The Court reached this determination for the following reasons.

First, as U.S. Bank argued, the Amended Complaint fails to state a claim under the Sherman Act because it alleged only an injury to TMT, not injury to competition in general. U.S. Bank Mem., p. 24. Without an injury to competition, there is no antitrust violation. Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962) (antitrust laws are "concern[ed] with the protection of competition, not competitors."); Brunswick Corp.,

429 U.S. at 489 (noting that an antitrust plaintiff must prove antitrust injury).   In an

antitrust action, the plaintiff must show an "injury of the type that the antitrust laws were

intended to prevent and that flows from that which makes defendants' acts unlawful."   In

re Canadian Import Antitrust Litig., 470 F.3d 785, 791 (8th Cir. 2006) (quoting Brunswick

Corp., 429 U.S. at 489).   The Eighth Circuit has held that "antitrust injury is a threshold

issue that plaintiffs must establish in order to have standing[11] to sue under the antitrust

---

[11]      Some courts distinguish between the "injury to competition" requirement of a
substantive Sherman Act claim and the requirements for standing to assert an antitrust
claim.   TheMLSonline.com, Inc. v. Regional Multiple Listing Serv. of Minn., 840 F. Supp.
2d 1174, 1180 (D. Minn. 2012) (citing Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d
268, 275 n.2 (3d Cir. 1999) ("The District Court erred by incorporating the issue of
anticompetitive market effect into its standing analysis, confusing antitrust injury with an
element of a claim under section 1 of the Sherman Act."); Doctor's Hosp. of Jefferson,
Inc. v. Southeast  Med. Alliance, Inc., 123 F.3d 301, 305 (5th Cir.1997) (distinguishing
between "antitrust injury and injury to competition, the latter of which is often a
component of substantive liability.")).   As the court noted in TheMLSonline.com. Inc.:
"[t]he two concepts are closely related, however, and the Eighth Circuit and decisions
from this District largely conflate the two and incorporate an injury-to-competition
requirement into the analysis of antitrust standing.  E.g., Midwest Commc'ns, 779 F.2d
at 450 (noting in its discussion of antitrust injury for purposes of determining standing
that "Congress enacted the antitrust laws to protect competition, not competitors"); Fair
Isaac Corp. v. Experian Info. Solutions Inc., 645 F.Supp.2d 734, 751 (D. Minn. 2009)
("[M]erely showing that [defendant] targeted and caused injury to [plaintiff] is insufficient
to show an antitrust injury necessary to establish antitrust standing.")."  840 F. Supp. 2d
at 1180.  In Minnesota Made Hockey, Inc. v. Minnesota Hockey, Inc., 789 F. Supp. 2d
1133, 1142-43 (8th Cir. 2011) the Eighth Circuit distinguished between antitrust
standing and antitrust injury, but then focused its standing analysis on whether plaintiff
had adequately pled that it was the target of anticompetitive activity.

        Neither party framed the issue of anticompetitive injury as a question of antitrust
standing.   Of course, the Court is entitled to "'examine standing sua sponte where
standing has erroneously been assumed . . . .'"   Meuir v. Greene County Jail
Employees, 487 F.3d 1115, 1119 (8th Cir. 2007) (quoting Adarand Const., Inc. v.
Mineta, 534 U.S. 103, 109 (2001)).   Even assuming that TMT did not need to show
competitive injury to establish antitrust standing, it was required to do so to assert a
substantive claim under the Sherman Act.   TheMLSonline.com, 840 F. Supp. 2d at
1180.   Therefore, the Court has focused its attention on TMT's failure to adequately
plead a substantive Sherman Act claim.

laws." <u>Fischer v. NWA, Inc.</u>, 883 F.2d 594, 597 n. 5 (8th Cir. 1989); <u>accord</u> <u>Midwest Commc'ns, Inc. v. Minn. Twins, Inc.</u>, 779 F.2d 444, 449 (8th Cir. 1985), <u>cert</u> <u>denied</u>, 476 U.S. 1163 (1986) ("[A]ntitrust standing requirements go beyond injury in fact; the court must also determine whether the plaintiff, even if injured, is a proper party to bring the action."). Whether or not a plaintiff has suffered an antitrust injury may be dispositive. <u>Midwest Commc'ns, Inc.</u>, 779 F.2d at 450 ("[I]f there is no showing of injury, or if the injury alleged is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws.").

In a vague and conclusory fashion, the Amended Complaint stated that the scheme involved "a multitude of victims including third-party debt purchasers and purchasers of U.S. Bank debt;" the conduct complained of "assure[d] that no parties <u>such as</u> TMT" would be able to bid successfully on the DDA Portfolios; and UCR and U.S. Bank worked together in a way that "restricted competition" and that the Sherman Act violations by UCR and U.S. Bank "had the effect of decreasing competition." <u>Id.</u>, ¶¶ 98, 169, 170. But TMT never named any of these supposed competitors. To the contrary, elsewhere in the Amended Complaint, TMT alleged that its bid on the April, 2011 DDA Portfolio was the only one U.S. Bank received, (Amended Complaint, ¶ 49), indicating that there were no competitors, at least for that DDA Portfolio. Additionally, TMT failed to reconcile its allegations that U.S. Bank reneged on its agreement to enter into a five-year forward flow agreement at a set price with TMT, (<u>Id.</u>, ¶ 221), with the supposed anticompetitive effects of U.S. Bank's relationship with UCR. In other words, on the one hand, TMT asserted that UCR and U.S. Bank "unreasonably restricted trade" by virtue of their exclusive dealings, but then asserted that it has been injured because

of U.S. Bank's refusal to enter into a similarly exclusive relationship through its own five-year forward flow agreement, albeit one not based on criminal activity. These facts undermine TMT's assertions regarding competitive injury. TMT responded that "the difference" was that it did not employ illegal means to obtain an exclusive relationship U.S. Bank. TMT's Mem., p. 27. Yet, as noted by U.S. Bank, the test for a violation of the antitrust law is whether otherwise legal conduct becomes illegal because it has anticompetitive effects. U.S. Bank Mem., p. 18, n.14; see also, In re Cardizem CD Antitrust Litig., 332 F.3d 896, 914, n.19 (6th Cir. 2003) (describing as a "basic premise" of antitrust law that "in many instances, an otherwise legal action – e.g. setting a price – becomes illegal if it is pursuant to an agreement with a competitor.").

Ultimately, the allegations in the Amended Complaint do not meet the minimal pleading requirement for a violation of Section 1 of the Sherman Act. See TheMLSonline.com, Inc., 840 F. Supp. 2d at 1182 (dismissing antitrust claims with prejudice because plaintiff only alleged that he was the victim of a conspiracy aimed at driving him out of business, which, even if true, did not establish an antitrust injury); Fair Isaac Corp., 645 F. Supp. 2d at 750 ("[M]erely showing that VantageScore targeted and caused injury to Fair Isaac is insufficient to show an antitrust injury . . . nor does the fact that the alleged goal of the conspiracy was to 'eliminate' Fair Isaac from the credit scoring industry automatically establish injury of the type the antitrust laws are designed to prevent.") (citing Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2 818, 823 (6th Cir. 1982) ("Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor.")); see also Ehredt Underground, Inc. v. Commonwealth Edison Co., 90 F.3d 238, 240 (7th Cir. 1996) ("Over and over, we stress

that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business.") (citations omitted); <u>Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n</u>, 961 F.2d 667, 670 (7th Cir.1992) (the antitrust injury doctrine "requires every plaintiff to show that its loss comes from acts that reduce output or raises prices to consumers.") (citations omitted); <u>AstraZeneca AB v. Glenmark Generics, Ltd.</u>, Civ. No. 14-665, 2014 WL 5366050, at *1, n.1 (D. Del. Oct. 9, 2014) (noting that the "Third Circuit has consistently held an individual plaintiff personally aggrieved . . . has not suffered an antitrust injury unless the activity has a wider impact on the competitive market.") (citation omitted); <u>In re Webkinz Antitrust Litig.</u>, 695 F. Supp. 2d 987, 996-997 (N.D. Cal. 2010) (granting motion to dismiss based on finding that plaintiffs provided no specific factual allegations of an alleged injury suffered by competition generally); <u>Banasavich v. McLane Co.</u>, Civ. No. 07-702, 2008 WL 4821320, at *4 (D. Conn. Oct. 31, 2008) (dismissing antitrust claims because "the complaint set forth allegations supportive of an injury to plaintiff's business, but antitrust injury must represent an adverse effect on competition as a whole in the relevant market rather than to plaintiff.")

Second, TMT did not allege that UCR and U.S. Bank were at the same level of market structure – a requirement for a claim of a horizontal restraint of trade.  <u>Double D. Spotting</u>, 136 F.3d at 558.  Although TMT argued in briefing that this was so, (TMT's Mem., p. 37), that argument was unsupported by any facts and it was not pled in the Amended Complaint.

Third, as U.S. Bank argued, (U.S. Bank Reply, p. 6), TMT never pled the existence of a horizontal agreement <u>between competitors</u>, a requirement for pleading a

per se illegal horizontal restraint of trade or illegal bid rigging scheme.  Business Elecs. V. Sharp Elecs. Corp., 485 U.S. 717, 730, n.4 (1988) ("[A] restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement."); Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 424 (8th Cir. 2009) (affirming district court's grant of summary judgment based in part on the fact that appellants failed to show the existence of an agreement between competitors at the same level of the market to restrain competition); United States v. Mobile Materials, Inc., 881 F.2d 866, 869 (10th Cir. 1989), cert. denied, 493 U.S. 1043 (1990) (defining "bid rigging" as: "any agreement between competitors pursuant to which contract offers are to be submitted [to] or withheld from a third party constitutes bid rigging per se violative of 15 U.S.C., section 1.") (emphasis added).

Apparently in recognition of its failure to plead the existence of a horizontal agreement between competitors, TMT argued that U.S. Bank "was in the same business" as TMT and UCR and was, as a result, their competitor.  TMT's Mem., p. 37. Not only were these alleged facts never pled, they are contrary to the facts that were alleged – that U.S. Bank is a national bank that sold its charged off DDA debt to third party debt purchasers, TMT is in the business of purchasing debt from vendors, and UCR is a limited liability company that purchases debt.  Amended Complaint, ¶¶ 1, 2, 6, 18.  Notwithstanding TMT's efforts to shore up its "horizontal restraint" argument by transforming U.S. Bank into a competitor of third party debt purchasers, it is obvious that the relationship between U.S. Bank, TMT and UCR was one of seller and purchaser, not competitor.

Significantly, the information reflected in Potillo's plea agreement supports this Court's conclusion that even accepting all of the allegations in the Amended Complaint as true, they do not describe a horizontal restraint of trade within the meaning of 15 U.S.C. § 1.  <u>See</u> Letter from TMT to Magistrate Judge dated October 19, 2015, Ex. A. Potillo's plea stated that Tate (described in the plea as "W.T.") would provide information to Potillo concerning the highest bids for the DDA Portfolios and the lowest minimum bid price U.S. Bank would accept.  <u>Id.</u>, ECF p. 25.  Based on that information, Potillo would submit bids that were slightly higher than the next highest bid and also above the minimum bids deemed acceptable to U.S. Bank.  <u>Id.</u>  Potillo paid Tate for providing this information.  <u>Id.</u>  Though TMT describes defendants' activities as "price-fixing" and "bid-rigging," (TMT's Mem., pp. 27, 28, 39; Amended Complaint, ¶ 169), two practices that are considered <u>per se</u> violations of § 1, the conduct alleged in the Amended Complaint is neither price fixing nor bid rigging.   Price fixing generally describes a "combination formed for the purpose of and with the effect of raising, depressing, fixing or stabilizing the price of a commodity."  <u>Eureka Urethane, Inc. v. PBA, Inc.</u>, 746 F. Supp. 915, 932 (8th Cir. 1990) (citation omitted).  Bid-rigging has a more specialized meaning in antitrust law and is analogous to bid rotation.  <u>United States v. Heffernan</u>, 43 F.3d 1144, 1150 (7th Cir. 1994) (noting that the "vast majority" of cases to consider the term "bid rigging" have treated it as synonymous with bid rotation).  Bid rigging or bid rotation occurs when two or more competitors agree which of them should be the low bidder for a particular job, and the others submit higher bids to make sure the designated bidder wins.  <u>Id.</u> at 1146.  <u>See</u> <u>also</u> <u>United States v. Reicher</u>, 983 F.2d 168, 170 (10th Cir. 1992) (defining bid rigging in the context of the

Sherman Act as "any agreement between competitors to which contract offers are to be submitted to or withheld from a third party.") (citation omitted).

As to price fixing, TMT alleged that Potillo and UCR conspired with Tate and U.S. Bank to obtain "inside information" to purchase the DDA Portfolios.   Amended Complaint, ¶¶ 100, 125.  This conduct is not price-fixing because there is no allegation that two competitors jointly set prices for their respective goods.   United States v. Socony–Vacuum Oil Co., 310 U.S. 150, 221 (1940) (describing horizontal price fixing as competitors who make an arrangement that interferes with the setting of prices by free market forces.).  Nor was it vertical price fixing, which occurs when a supplier attempts to fix prices charged by those who resell its products.  Kingray, Inc. v. NBA, Inc., 188 F. Supp. 2d 1177, 1188 (S.D. Cal. 2002) (citations omitted).

This alleged conduct is also not bid-rigging since there is no allegation that UCR and TMT (again, the only two competitors named in the Amended Complaint) agreed in advance of submitting their bids for the DDA Portfolios that one of them would offer a higher bid in order for the other to win the contracts.  See Heffernan, 43 F.3d at 1146; Reicher, 983 F.2d at 170.

Because the Amended Complaint failed to allege a per se violation of § 1 and is otherwise devoid of any allegation that U.S. Bank's conduct restrained trade in a way prohibited by the antitrust laws, it fails to state an antitrust claim and Count Three should be dismissed.

TMT submitted that it should be allowed to replead its antitrust claim under a rule of reason.  TMT's Mem., p. 41.  TMT correctly noted that generally leave to amend a

complaint should be granted in the absence of undue delay or bad faith and when an amendment would not be futile or unfairly prejudice a party.  Id. (citations omitted).

To the extent TMT is actually moving for leave to amend, its request is not properly before the Court.  See Gomez v. Wells Fargo Bank, N.A., 676 F.3d 655, 665 (8th Cir. 2012) ("'A district court does not abuse its discretion in failing to invite an amended complaint when plaintiff has not moved to amend and submitted a proposed amended pleading.'") (quoting Drobnak v.. Andersen Corp., 561 F.3d 778, 787 (8th Cir. 2009)); accord Misischia v. St. John's Mercy Health Sys., 457 F.3d 800, 805 (8th Cir. 2006) (district court did not abuse discretion in denying leave to amend where plaintiff requested leave "with a one line request in his brief opposing defendants' motion to dismiss," filed "no motion for leave to amend [,] and did not explain the substance of his proposed amendment").  However, even if this request to amend were properly before the Court, the Court nonetheless recommends dismissal of Count Three with prejudice because any proposed amendment by TMT is futile.

The Court is mindful that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators."  Double D. Spotting, 136 F.3d at 560.  That said, a court may dismiss claims with prejudice if repleading would be futile.  Sellors, 2014 WL 1607747, at *14; Bernstein v. Extendicare Health Servs., Inc., 607 F. Supp. 2d 1027, 1032 (D. Minn. 2009).  The Court has considered that TMT has proposed amending its Amended Complaint to allege an antitrust violation under the "rule of reason," (TMT's Mem., p. 41), and has stated that it was prepared to amend to allege the facts described in Potillo's plea agreement.  Letter to Magistrate Judge from

TMT dated October 19, 2015, p. 2.  However, even if these amendments were allowed, the conduct TMT intends to plead still does not fall within the scope of § 1.  Indeed, after amending once, briefing its opposition to U.S. Bank's motion to dismiss and submitting an unsolicited post-hearing letter brief, TMT has still not adequately alleged or presented evidence that it could allege the injury that is at the heart of antitrust law – <u>an injury to competition, not individual competitors</u>.  <u>See</u> <u>TheMLSonline.com, Inc.</u>, 840 F. Supp. 2d at 1182 (dismissing antitrust claims with prejudice where plaintiff failed to allege competitive injury).  On this basis, the Court has concludes that any repleading is futile and, therefore, recommends dismissal of Count Three with prejudice.  <u>See</u> <u>Five Smiths</u>, 788 F. Supp. at 1051-1053 (dismissing antitrust claims with prejudice and without leave to amend because plaintiffs alleged only injury to themselves, not to competition, therefore, any rule of reason claim failed) (citing <u>Garshman v. Universal Resources Holding, Inc.</u>, 824 F.2d 223, 230-231 (3d Cir. 1987) (affirming district court's dismissal of Sherman Act claim noting that "what was still missing" under a rule of reason analysis was "any allegation of an adverse effect on competition."); <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984) (stating that a rule of reason claim requires a plaintiff to "allege, not only an injury to himself, but an injury to the market as well"); <u>Caremark Homecare Inc. v. New England Critical Care</u>, Inc., 700 F. Supp. 1033, 1036 (D. Minn. 1988) (rule of reason claim requires plaintiff to plead "anticompetitive effect on the market as a whole."); <u>Schwartz v. Jamesway Corp.</u>, 660 F.Supp. 138, 141 (E.D. N.Y. 1987) (dismissing antitrust claim pled under the rule of reason because plaintiff failed to allege competitive harm and noting "[p]laintiff merely states that he has been injured in his business.  Such pleading does not state an

antitrust claim because it does not allege an injury to competition among several competitors.") (citation omitted)).

**C.**   **State Law Claims**

The Court concluded that TMT's federal claims based on RICO and the Sherman Act fail as a matter of law.   These were the claims on which the subject matter jurisdiction of the Federal District Court was premised.   Amended Complaint, ¶ 9.   TMT invoked jurisdiction over the state law claims under the supplemental jurisdiction statute, 28 U.S.C. § 1367, which provides jurisdiction over state law claims forming part of the same case or controversy as the federal claims.   Hartnack is a Minnesota resident and TMT is a Minnesota Limited Liability Corporation.   Amended Complaint, ¶¶ 1, 5. Therefore, the Court cannot maintain the case in federal court based on diversity.[12] "When the court dismisses federal claims, and there is no basis for diversity jurisdiction, the court no longer has original jurisdiction over the action and must consider whether to exercise supplemental jurisdiction over the state-law claims."   Walsh Bishop Assocs., Inc. v. O'Brien, Civ. No. 11-2673 (DSD/AJB), 2012 WL 669069, at *8 (D. Minn. Feb. 28, 2012) (citing 28 U.S.C. § 1367(c)(3); Johnson v. City of Shorewood, 360 F.3d 810, 819 (8th Cir. 2004)).   "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine [judicial economy, convenience, fairness and comity -] will point toward declining to exercise jurisdiction over the remaining state-law claims."   Id. (quoting Johnson, 360 F.3d at 891, quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988)). Based on these factors, the Court finds that supplemental jurisdiction over TMT's state

---

[12]   At the motion hearing, U.S. Bank's counsel conceded that if the federal claims were dismissed, jurisdiction would be lacking over the state law claims.

law claims against U.S. Bank (Counts Four (Violation of Minn. Stat. Chapter 325F), Five (Respondeat Superior), Eight (Breach of Contract) and Nine (Unjust Enrichment)), along with Counts Six (Intentional Misrepresentation) and Seven (Negligent Misrepresentation) against U.S. Bank and vanBranswijk and Hartnack, should not be undertaken. Therefore, the Court recommends that all state claims be dismissed without prejudice.

### D. Dismissal of Federal Claims Against Remaining Defendants

The Court acknowledges that Tate, UCR and Potillo, who are named in Counts One (Civil RICO) and Two (Conspiracy to Violate RICO), and UCR, which is named in Count Three (Violation of Section 1 of the Sherman Act), did not move for dismissal. In fact, neither Tate nor UCR have made an appearance in this case. Nonetheless, the Court recommends dismissal of these claims against these defendants with prejudice because, as set forth above, the claims fail as a matter of law. See, e.g. Silverton v. Department of Treasury, 644 F.2d 1341, 1345 (9th Cir. 1981) ("A District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related.") (citations omitted); Silva v. Federal Nat'l Mortg. Corp., Civ. No. 15-1514, 2015 WL 9460559, at *5, n.2 (D. N.J. Dec. 23, 2015) (granting moving defendants' motion to dismiss and noting that "[a] court dismissing claims against moving defendants may sua sponte dismiss identical claims against non-moving defendants.") (citation omitted); Rose v. Arkansas Valley Envtl. & Util. Auth., 562 F. Supp. 1180, 1213, n.11 (W.D. Mo. 1983) ("While only Rausch has moved for dismissal on this basis, it is clear that the same ruling would inevitably apply

to each of the defendants.  In these circumstances a court is empowered to act, <u>sua sponte</u>, to grant dismissal as to <u>all </u>defendants.") (emphasis in original) (citation omitted).

## IV.   RECOMMENDATION

For the reasons set forth above, it is recommended that U.S. Bank's Motion to Dismiss [Docket No. 51] be **GRANTED** in part and **DENIED** in part as follows:

1.   Counts One (Civil RICO), Two (Conspiracy to Violate RICO), Three (Violation of Section 1 of the Sherman Act) should be dismissed with prejudice as to all defendants.

2.   Counts Four (Violation of Minnesota Statute Chapter 325F), Five (Respondeat Superior), Count Six (Intentional Misrepresentation (Fraud)), Seven (Negligent Misrepresentation), Eight (Breach of Contract) and Nine (Unjust Enrichment) should be dismissed without prejudice.

3.   Count Ten (Negligent Supervision) should be dismissed with prejudice as to U.S. Bank.

Dated: January 4, 2016                                    *Janie S. Mayeron*
                                                                 JANIE S. MAYERON
                                                                 United States Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 18, 2016,** a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.